151 So.2d 257 (1963)
STATE of Florida ex rel. THE FLORIDA BAR, Complainant,
v.
Perry NICHOLS, Respondent.
No. 31717.
Supreme Court of Florida.
February 27, 1963.
On Rehearing April 3, 1963.
T.H. Johnson, Rivera, and Maxwell W. Wells, Orlando, for complainant The Florida Bar.
Chester Bedell, Jacksonville, for respondent.
Charles S. Ausley, Tallahassee, amicus curiae.
TERRELL, Justice.
In this proceeding respondent, a member of The Florida Bar, is charged with violating Canon 27 of the Canons of Professional Ethics, 31 F.S.A. He was found guilty by the Grievance Committee who recommended that he suffer a private reprimand. On review by the Board of Governors, they recommended that respondent suffer a public reprimand. That judgment is before us for review.
Canon 27 of the Canons of Professional Ethics has to do with advertising, direct and indirect, by attorneys and is as follows:
"It is unprofessional to solicit professional employment by circulars, advertisements, *258 through touters or by personal communications or interviews not warranted by personal relations. Indirect advertisements for professional employment such as furnishing or inspiring newspaper comments, or procuring his photograph to be published in connection with causes in which the lawyer has been or is engaged or concerning the manner of their conduct, the magnitude of the interest involved, the importance of the lawyer's position, and all other like self-laudation, offend the traditions and lower the tone of our profession and are reprehensible; but the customary use of simple professional cards is not improper.
"Publication in reputable law lists in a manner consistent with the standards of conduct imposed by these canons of brief biographical and informative data is permissible. Such data must not be misleading and may include only a statement of the lawyer's name and the names of his professional associates; addresses, telephone numbers, cable addresses; branches of the profession practiced; date and place of birth and admission to the bar; schools attended; with dates of graduation, degrees and other educational distinctions; public or quasi-public offices; posts of honor; legal authorships; legal teaching positions; memberships and offices in bar associations and committees thereof, in legal and scientific societies and legal fraternities; the fact of listings in other reputable law lists; the names and addresses of references; and, with their written consent, the names of clients regularly represented. A certificate of compliance with the Rules and Standards issued by the Special Committee on Law Lists may be treated as evidence that such list is reputable.
"It is not improper for a lawyer who is admitted to practice as a proctor in admiralty to use that designation on his letterhead or shingle or for a lawyer who has complied with the statutory requirements of admission to practice before the patent office, to so use the designation `patent attorney' or `patent lawyer' or `trademark attorney' or `trademark lawyer' or any combination of those terms." (Emphasis supplied)
We have not been previously called on to construe Canon 27 and we are cited to no case in which it has been construed by other courts of last resort. The first sentence of paragraph one, Canon 27, condemns direct advertisement for professional employment by the use of circulars, advertisements through touters or by personal communications or interviews not warranted by personal relations. All such advertisement is "unprofessional."
The second sentence of paragraph one, Canon 27, also condemns "indirect advertisements" for professional employment such as furnishing or inspiring newspaper comments or procuring his photograph to be published in connection with causes in which the lawyer has been engaged, or concerning the manner in which he handles cases or their magnitude, all of which is "self-laudation." These "offend the traditions and lower the tone of our profession and are reprehensible."
The second and third paragraphs of Canon 27 advise a lawyer in plain language where and how he may announce to the world that he is a lawyer, what he may put in his announcement and that he is prepared to accept professional calls. In this he is permitted to include brief biographical and informative data, his educational qualifications, schools attended, books or periodicals he has authored, positions of trust he has held and any specialized practice he intends to follow besides other items listed in the canon, but he is not expected to put on a haughty air and "brag" about these things so as to offend the profession.
In this proceeding respondent is charged with "indirect advertisement" as condemned by the second sentence of paragraph one of Canon 27 as quoted and emphasized *259 above. The pertinent part of the complaint so charging him is as follows:
"That respondent did furnish information to reporters of the Miami News for an article which appeared in said newspaper on page 3B, dated December 13, 1959, as will more fully appear by the newspaper article attached hereto and made a part hereof; that the aforementioned information furnished by respondent, and which appeared in said newspaper article is selflaudation. (sic)"
"Self-laudation" is a very flexible concept; Canon 27 does not define it, so what course of conduct would be said to constitute it under a given state of facts would no doubt vary as the opinions of men vary. As a famous English judge said, it would vary as the length of the chancellor's foot. It must be in words and tone that will "offend the traditions and lower the tone of our profession." When it does this, it is "reprehensible." This seems to be the test by which "self-laudation" is measured. It must be wrapped in a pharisaical slight or some species of reproach to "offend the traditions and lower the tone of our profession."
In this case it appears that respondent was approached by representatives of the Miami News, a very reputable newspaper published in Miami, Florida, to secure information to prepare a news story about respondent, his law practice and his office building recently constructed. The said office building and appointments are unique and both building and proprietor are admitted to be newsworthy. It is common practice now for lawyers, doctors, farmers, business men and others to build nice homes, office buildings, business and professional buildings, give a grand opening, invite the public and get the whole affair written up in the paper with pictures of every detail of it. When a lawyer does this and permits the affair to be described and published as news in a single issue of the paper, we see no basis to charge him with violating Canon 27. We can see nothing in such venture "to offend the traditions or lower the tone of our profession." There is a distinct difference in a venture like this published once as news for the information of friends and public and an article or card published daily to entice patronage or business.
Now let us look at the article prepared by representatives of the Miami News from the answers to the questions they propounded to respondent in their engagement with him. It is admitted that the article consists solely of deductions of said representatives of the Miami News from the answers of respondent to their questions. Respondent did not compose or criticize the answers.
If read in isolation, some of these answers might be construed as "self-laudation," but not so if read in context. The following are some examples: "But the enormous damages which he has collected for his clients represent only a fraction of the wealth he has redistributed." "He's the biggest showman since Barnum and Bailey," declared one judge. "He doesn't have such great talent as a lawyer, but he's a tremendous organizer." "When he describes an accident, he recreates the event so the jury can live every moment of it. No one can do it better."
These are samples of what others said of respondent that we say might be construed as "self-laudation" if read in isolation. The article from which these examples were taken covered one page of the Miami News (Sunday, December 13, 1959). Its primary purpose was a "news story"; it was sought after and composed by newsmen and was not thought of as being used for any other purpose by the newsmen or respondent.
The article is entitled "He Started With $10 And A Bride." It is divided into seven parts; parts six and seven may be classed as biographical; then there are spots all through it that are biographical. In fact, if one were writing a biography of respondent, every line of the article could be used *260 with good taste. Many Florida lawyers have no doubt read Louis Nizer's "My Life in Court," Irving Stone's "For the Defense," "Final Verdict" by Adela Rogers St. Johns, "Hoke Smith and the Politics of the New South," by Dewey W. Grantham, "Country Lawyer," "City Lawyer," and others of this type. They are biographical, but no one has yet charged that they violate the Canons of Ethics.
Then there is the great body of posthumous law literature like Beveridge's "Life of Marshall," and the scores of books written by and about other lawyers, many of which might be said to translate a thread of self-laudation but no one ever charged that they violated Canon 27. In fact, if a lawyer by labor and experience has developed a rule or principle that aids in the administration of justice, or in some other manner benefits the public or his profession, Canon 27 was never designed to prevent him from writing a book, a dissertation or making a speech about it. Giving back to one's profession an idea or something of value is the pride of every lawyer worthy the name. Such a book or dissertation is in a very different class from releases or compositions designed to attract business and are not banned by Canon 27, or any other rule of ethics. Failure to distinguish that difference may have been responsible for the error in bringing this proceeding, but this is in no sense a criticism of the bar for bringing it; it was navigating an uncharted sea without compass to guide it and as we shall hereafter point out, where the line should be drawn to protect the canon is often difficult to indicate. We would prefer to commend them for their diligence in adhering to the canons.
The standing committee on professional ethics, American Bar Association, was recently confronted with a question somewhat akin to this, the question being as follows: Does a lawyer's release of news items of his activities to a newspaper for publication, unsolicited by the newspaper, constitute unethical conduct?
October 24, 1961, the committee gave the following answer:
"Canon 27 condemns indirect as well as direct forms of advertising and soliciting.
"In Opinion 244, this Committee said:
"`The evil at which Canon 27 is aimed primarily is the employment by those engaged in the profession of law of commerical methods of obtaining business.'
"The question propounded assumes that the newspaper does not solicit the proposed news releases, but that the lawyer solicits the newspaper to accept for publication the proposed news material directly portraying the activities of the lawyer, designed to accomplish the ulterior purpose of extolling his good name and virtues to the general public. Such conduct of necessity would constitute a form of public self-laudation designed indirectly to further the professional interests of the lawyer."
We do not think this answer in any way rules the question with which we are confronted. In this case the newspaper voluntarily solicited the material for the article as a news story only; respondent solicited nothing and the news material he gave did not portray his virtues or good name to the public; the story would not be classed as a commercial method of securing business and for other good reasons stated in this opinion, the most conclusive of which is that respondent was answering the request of his profession to exhibit his method of dispatching legal business.
Other top features of the article have to do with (1) tilts that respondent had with certain insurance companies in his early experience as a practitioner; (2) the fact that respondent's practice is limited to negligence cases, his large office staff and the fact that three or four hundred other lawyers take negligence cases to him; the manner in which his office is organized and *261 handles the business brought to it. He has specialists in engineering, traffic, medicine and other fields. These facts give one an idea of the magnitude of the organization and system of control. (3) Comments of judges, lawyers and others about respondent's methods and results accomplished for his clients. (4) Reasons that led respondent to approve the circular design of his five-story office building; distribution of cases among the staff and the manner in which research aids in dispatching them. (5) Promptness with which a team from the firm is organized for work on an important case and how the trophy room and the dummy (Mabel) aid the preparation of cases for trial. The time that respondent spends traveling over the country lecturing to law clinics, bar associations and other law societies about his organization and method of handling cases as pointed out in this paragraph. Since these lectures were requested by the bar, accepted by them without question, at respondent's expense, it would seem that "in good taste" they should not be condemned by Canon 27. In the conduct of cases a lawyer is bound by good faith, the decencies of the profession, courtesy to the court and his brethren, the rules of procedure and the Constitution. It is not shown that these were violated.
In analyzing and discussing the article which is alleged to have violated Canon 27, we may have been verbose, but we deemed it necessary to demonstrate that said article does not offend Canon 27, We know of no more impressive way to do this than to lay the canon beside the article and to show the tenor and purpose of each. We think this discussion shows that the article was a "news story" and was not intended for anything else. If we have shown this, that disposes of the lawsuit. It is not charged that respondent's methods are contrary to prescribed rules of procedure, that they are unorthodox or that they "offend the traditions and lower the tone of our profession."
The record shows conclusively that the gentlemen who interviewed respondent were looking for information for a "news story"; it further shows that respondent understood that he was giving them material for a "news story"; that he well understood the language and purpose of Canon 27, and other canons of behavior, and instructed the representatives of the Miami News to cast their story in such dignified terms as not to violate the canons of behavior. He did not exact the privilege of editing the story before publication which he had a right to do. Respondent did not inspire the story but the newsmen sought respondent to secure information for it. The methods used by respondent are no different from those of any other careful lawyer in handling cases.
In his excellent work "Legal Ethics," Mr. Henry S. Drinker, of the Philadelphia Bar, says that "Just where the line should be drawn beyond which it is incumbent on the lawyer to protect it [the canon] is difficult to say. In its ultimate analysis the question, like many of those involving legal ethics, is one of good faith and good taste." These are determined by the facts of the particular case, judged by those competent to tell when it is in good faith and good taste.
To cite a lawyer to be reprimanded for violating the Canons of Ethics creates a stain on his escutcheon that, like the emblem of ownership impressed on a range cow with a branding iron, never wears away. True, there are extreme cases that merit it, but it should not be imposed except in those cases where showing of violation of the canon is deliberate and conclusive. In Othello, Act iii, scene 1, Shakespeare prompts Iago to say, "Who steals my purse steals trash; * * * But he that filches from me my good name, Robs me of that which not enriches him, And makes me poor indeed." A lawyer's integrity and his good name are his most precious assets and they should not be smutted in a case like this absent a clear showing of lack of good faith and good taste.
From what we have said, we think we have shown (1) that the article which is alleged to have violated Canon 27 was *262 primarily a "news story," was so intended by the Miami News and respondent, that its whole tenor and purpose demonstrate this and being so, it was not subject to condemnation by the terms of Canon 27. (2) The article was biographical in tenor and was designed in the main to demonstrate respondent's methods of building and conducting an extensive law business about which he had lectured many times over the country to law clinics, bar associations and other societies at their invitation and at his expense, and (3) in so doing he was returning to his profession something of value that could under no process of reasoning be called commercial advertising as condemned by Canon 27. It would not be good taste or good "gumption" to condemn respondent for what the bar had repeatedly requested of him and for what the canon in terms permits. When we eliminate those parts that are biographical and those parts having to do with lecturing over the country at the invitation of the bar to discuss his methods, we find nothing of substance to support the complaint. Things said about him by other lawyers and judges would not support self-laudation, nor would they "offend the traditions or lower the tone of our profession."
The judgment or recommendation of the Board of Governors is accordingly quashed and the complaint dismissed.
ROBERTS, C.J., and THOMAS and DREW, JJ., concur.
THORNAL, J., concurs specially.
O'CONNELL, J., dissents with opinion.
THORNAL, Justice (concurring in judgment).
I agree to the judgment of the majority but I do not agree to all of the reasons announced to support the judgment. It is crystal clear from the record that there was no purposeful intent to violate Canon 27. In addition, Mr. Nichols admittedly was a newsworthy lawyer and the press sought him, he did not seek the press. Even so, I consider some of the statements attributed to him to be at least indiscreet. To this extent I have the view that in press conferences lawyers should "go the extra mile" to forestall erroneous interpretations of their statements regarding themselves. However, in view of the posture in which the instant case reaches us, the only fair and proper judgment is the one reached by the majority.
O'CONNELL, J., Concurring in part and dissenting in part.
I concur in that part of the majority opinion which quashes the judgment and recommendation of the Board of Governors because I believe a private and not a public reprimand, as recommended by the Board of Governors, is warranted under the facts of this case. I regret that I must dissent from the other portions of the majority opinion. I must do so because I feel that the opinion, almost if not wholly, destroys that portion of Canon 27 dealing with indirect advertisements for professional employment, adds further confusion to an imperfectly drafted rule of conduct, and establishes a precedent that is certain to result in damage to the standards of the legal profession in this State.
Because the facts are not fully set forth in the majority opinion it is necessary to state some additional ones which I feel pertinent to a proper decision in this cause.
After the complaint here involved was filed by The Florida Bar a referee was designated to hear the evidence relating to the complaint. After a hearing this referee made his report to the Board of Governors of the Bar.
In his report the referee found the newspaper article in question to be "laudatory in the extreme", that the respondent "furnished" or "inspired" most of the quotes attributed to him in the article, and that respondent could have, or should have, exercised *263 some degree of censorship over the article either through his influence with the reporter or editor of the newspaper, or exercised some control or restraint in the furnishing of the information, well knowing that it might be published. The referee concluded that this failure to exercise censorship, control or restraint over the material given the press constituted a violation of Canon 27.
The referee, however, specifically absolved respondent of any taint of suspicion that he caused or in any way procured or solicited the publication of the article involved, or that he intentionally or consciously engaged in indirect advertising for professional employment by furnishing the information which was written into the article.
The referee recommended that respondent "be given a private reprimand to be more circumspect and restrained in any conversations with the press well knowing the proclivity of this profession to quote or rather `to substantially quote' any remarks deemed by them to capture reader interest" and recommended that no further disciplinary action was warranted under the circumstances.
On review of the referee's report the Board of Governors concurred with the referee in the finding that respondent had violated Canon 27, but instead of a private reprimand as recommended by the referee determined that respondent should receive a public reprimand.
For reasons which will be set forth later I think that the facts of this case do not warrant a public reprimand but that they do warrant just what the referee recommended, i.e. that respondent be advised to be more circumspect and restrained in any future conversations with the press concerning his practice of law.
In his brief respondent contends that the complaint, set forth in the majority opinion, was not sufficient to adequately charge a violation of Canon 27 and that the evidence was not sufficient to prove a violation of said canon.
In its brief the Bar urges that the issues presented by respondent should be restated to read:
"1. Is the allegation * * * that respondent furnished self-laudatory information to a reporter * * * for an article, a sufficient allegation of a violation of Canon 27?
"2. Is the evidence, showing conclusively that respondent furnished self-laudatory information to a reporter, knowing it was to be published, and without insisting beforehand on the right to edit it before publication, sufficient to prove the violation of Canon 27?"
I think this statement of the issues by the Bar correctly defines the questions to be decided in this cause.
The facts are simple and are not controverted.
The Miami News decided that a "profile" article on respondent would have reader interest and assigned two reporters to gather material and write such an article. One reporter, Mr. Colbert, after several attempts contacted respondent and arranged to interview him at his office. This interview lasted more than two hours. During the course of the interview the reporter, at his request, was taken on a tour of the unique office building of respondent's law firm during which he asked questions regarding what he saw, the organization and method of operation of the firm, and respondent furnished explanations. The whole interview appears to have been one in which questions were propounded by the reporter and respondent furnished answers. Respondent refused to answer questions relating to the income of his firm or its size as compared to other firms.
The other reporter assigned to the article did not interview respondent, but interviewed lawyers and judges and statements of several were incorporated into the article.
*264 Thereafter the article in question was published in the Miami News.
The article covered a full page of the newspaper. It included a picture of respondent at his desk and two pictures of his firm's building. These pictures are not involved here.
It is mechanically impossible to reproduce a copy of the article in the reported version of this opinion. Therefore it will be necessary to summarize in part and to copy it in part where such is necessary to an understanding of this opinion.
The article is entitled "HE STARTED WITH $10 AND A BRIDE." It commences:
"This won't seem so funny to anyone with a financial interest in the insurance companies which bought Attorney Perry Nichols his million-dollar, circular office building at 1111 Brickel Ave.
"But Nichols was amused at his own joke.
"Say that I was educated AND trained by the insurance companies. That'll shake 'em up."
The article then deals with respondent's success in bringing millions of dollars from the insurance companies he once represented and quotes him in defense of what such companies say about him.
Respondent is then quoted as saying:
"`There are eight partners in the firm,' he said, `and we have eight more lawyers working for us  exclusively on damage cases. Also since we're equipped for this special practice, 300 to 400 other lawyers send us their negligence cases.'"
Respondent is then quoted in explaining his activities in teaching other attorneys the methods used by his firm, in explaining that when he represented insurance companies they won most of the cases because the plaintiffs' attorneys were poorly prepared and then in defending himself against the complaint that he gets excessive awards for his clients thereby increasing insurance rates.
Then under the subtitle "$225,000 ISN'T MUCH" he is quoted as giving an explanation justifying a verdict in that amount given one of his clients in a suit against a utility company.
Then followed comments and quotes of circuit judges and attorneys regarding respondent.
The article continued with comment on the five story "roundhouse" which houses the firm and an explanation, attributed to respondent, of the unusual design of the building. Intermingled with these comments the article credited respondent with having "the benefit of one of the most thorough-going legal organizations in the country" and explained "that there are 51 persons" working in the building.
Following this Mr. Nichols is quoted as outlining the organization and operation of the firm in these words:
"`We work in teams' Nichols explained, `and the building is arranged so as to make it easy for the members to get together.
"`The lawyers specialize in different types of cases. For instance, Bill (William S.) Frates used to represent the railroads. I got tired of locking horns with him and persuaded him to come into the firm. Now he handles railroad cases for us.
"`Other members of the firm specialize in auto and pedestrian accidents; accidents involving utilities; airlines and other fields.
"`We have a fulltime doctor heading a medical department; two lawyers to do legal research; eight investigators, all of whom are former FBI Agents or insurance adjustors, and a photo department.'"
*265 Next under the subtitle "THEY'LL ACT WHEN CALLED" the article stated that the respondent's firm was then working on an auto accident in which two persons were killed and three injured the previous week and on the National Air Lines crash which occurred on November 16, 1959 in the Gulf of Mexico.
Respondent is then quoted as saying:
"`We were called into both cases the day after the accident,' said Nichols, `We don't move until somebody retains us.
"`We had teams working within 30 minutes after the calls were received.
"`On the NAL crash, we sent two lawyers, a cameraman and investigators, one of whom used to work for the Civil Aeronautics Board. They inspected the wreckage, made movies of the searchers picking up the debris and interviewed everyone who had any knowledge of the accident.'"
The article then outlined the activities of the team assigned to the auto wreck, and continued with a discussion of the use of visual aids by the firm, the trophy room containing models and evidence used in prior cases, and other visual aids.
There followed information on respondent's birthplace, attendance at college, his arrival in Miami, his employment by an adjustment bureau, his opening his law office, his representation of Hialeah race track as attorney, and chief lobbyist and other matter not pertinent here.
The reporter, who interviewed respondent and wrote all of the article except the head and subheads and that portion dealing with the comments of judges and lawyers about respondent, testified that he had advised respondent that he wanted to talk with him so that he could do a story about him and that respondent suggested the reporter come down to his office to discuss it; that he did so and interviewed respondent for about 2 1/2 hours.
In response to questions about the accuracy of the quotes and other information indicated by the article to have come from respondent the reporter explained that:
"* * * the information is accurate, but that Mr. Nichols didn't put it in those words. What I was doing was condensing a number of answers to questions, statements and so forth over a period of time into one simple statement."
Respondent testified that he knew that the interview was to be used as the basis for an article about himself and his success; that near the end of the interview the reporter asked him to pose for photographs inside his office building and he refused explaining to the reporter that such might be in violation of Canon 27; that he then asked the reporter if he would have the opportunity to edit the article before it was published and the reporter advised him that such was not his prerogative whereupon he told the reporter that he wanted him to write the article "in good taste, in dignity, within the keeping of the legal profession."
As to the accuracy of the article and of the quotations attributed to him respondent testified that the "content and theme of the article is basically correct", but that the quotations were not verbatim quotes and in many instances "are not my quotes." He testified that he could not remember whether he had or had not furnished the reporter all the quotes or facts attributed to him, because of the lapse of time since the interview; however, he did not deny that he had furnished such information, nor did he contend that the information was inaccurate.
Witnesses other than respondent and the reporter, Mr. Colbert, testified on behalf of respondent but their testimony has no bearing on a decision in this case.
That portion of Canon 27, Canons of Ethics Governing Attorneys, involved herein reads as follows:
"27. Advertising, Direct or Indirect.  It is unprofessional to solicit professional *266 employment by circulars, advertisements, through touters or by personal communications or interviews not warranted by personal relations. Indirect advertisements for professional employment such as furnishing or inspiring newspaper comments, or procuring his photograph to be published in connection with causes in which the lawyer has been or is engaged or concerning the manner of their conduct, the magnitude of the interest involved, the importance of the lawyer's position, and all other like self-laudation, offend the traditions and lower the tone of our profession and are reprehensible; but the customary use of simple professional cards is not improper." (Emphasis added.)
The respondent and the Bar interpret the canon differently.
The respondent takes the position that while the poor structure of the pertinent portion of the canon somewhat obscures its meaning "the clear intent is to proscribe solicitation or procurement by the lawyer of published advertisements." Pursuing this theory he argues that "the mere furnishing of information made the basis of newspaper comments is not condemned, absent the essential element of solicitation by the lawyer." He argues also that the Canon does not make it unethical for a lawyer to submit to an interview such as here, and therefore such conduct cannot be made the basis of disciplinary action as attempted in these proceedings.
Respondent complains that although the judgment of the Board of Governors is based upon a finding that the article in question is "offensive and in extremely poor taste", he only answered questions honestly, without exaggeration, used no superlatives and expressed no laudatory opinion of himself, he did not write the article, did not choose the subjects explored, did not suggest the "slant" of the article, but on the contrary declined to answer some questions with Canon 27 in mind and admonished the reporter to keep the article in good taste and in keeping with the Canon. It is Respondent's position that he complied with the Canon because he did all that he could "short of declining the interview altogether."
As interpreted by the Bar "the furnishing of self-laudatory comments to the press, with the idea that they would be published, in itself constitutes the violation" of the Canon. It says the "Canon leaves no doubt that a lawyer is engaging in indirect advertising when he provides such information to a newspaper."
While the Bar agrees with respondent that the Canon does not prohibit an attorney from participating in an interview with a representative of the Press it contends that an attorney has a responsibility to do more than merely admonish the reporter to keep the article in good taste and in keeping with the Canon. The Bar points out that the Press has no obligation to observe the Canons of Ethics, and that if they are to be upheld such must be done by the members of the Bar.
The Bar argues that "It is the lawyer's responsibility to refrain from giving information that could result in such an article, and if he is unable to control what is published, to refuse the interview."
The Bar urges that "If this court should not uphold the judgment in this case, it will say in effect that it condones the conduct of a lawyer who tells for newspaper publication the size and success of his firm, its speed and superiority in preparing a case, the actual techniques by which this is done, and who illustrates the discussion with examples from current cases  just as long as he did not solicit the interview."
As pointed out by both the Bar, and the majority opinion, there is little precedent to guide us or them in an interpretation of the Canon here involved.
Both parties rely to some extent on Opinion No. 806, rendered by the Committee on Professional Ethics, Association of the *267 Bar of the City of New York, rendered May 2, 1955, reprinted in Opinions on Professional Ethics, Legal Studies of the William Nelson Cromwell Foundation, pp. 498-499.
In the last cited opinion the attorney requesting the opinion stated that two magazines, which proposed to publish articles on his work and career as a lawyer, had requested his cooperation in preparation of the articles.
He asked the committee to advise him whether: (1) it was his duty to discourage publication of the articles; (2) he could properly respond to questions about his life and work as a lawyer, (3) he could volunteer information, personal, professional and about cases handled, and (4) it was his duty to insist on reviewing such articles before publication in order to correct misstatements and exaggerations.
The committee gave its answer in the following words:
"* * * Answer. Self-laudation or touting by a lawyer is reprehensible. He may not properly encourage laudatory statements in newspapers and magazines as to his professional attainments or collaborate in their preparation. However, the press and the public have a proper and legitimate interest in newsworthy incidents in the career and activities of a lawyer. This would be especially true in the case of a lawyer who had occupied prominent positions, public or private, or where he was a candidate for election or appointment to public office and such matters might be relevant to his qualifications.
"Therefore, a lawyer may with propriety answer questions and volunteer personal or professional non-privileged data in connection with the preparation of such an article regarding his career, so long as he insists that the article be dignified and in good taste and be written in such a tone as not to imply to the public that it is intended to constitute advertisement for professional employment. He should also see to it, so far as possible, that the article as published carries out his instructions. * * *"
"A lawyer may properly review an article submitted in advance of publication, and he should not only correct any inaccuracies but should insist upon the elimination of material not in good taste. It would be the duty of a lawyer to discourage the publication of an article where he knew in advance that it was sensational or undignified, or might be construed as advertising, and he should give no aid in its preparation. On the other hand, it is not incumbent upon a lawyer publicly to disclaim or deprecate all such published statements which may have been made concerning him, at least unless such statements are very blatant and made under circumstances which might convey the idea that they were inspired by him. As stated by Drinker: `Just where the line should be drawn beyond which it is incumbent on the lawyer to protect it is often difficult to say. In its ultimate analysis the question, like many of those involving legal ethics, is one of good faith and good taste.'"
I do not give this opinion the weight of precedent. However, it does illustrate the views of a group of attorneys on a question not dissimilar to that involved here and it offers a starting point for our discussion.
As I read that opinion, as pertinent here, it holds that an attorney: (1) may not properly "collaborate in * * * preparation" of laudatory statements in newspapers; (2) may submit to an interview, answer questions and volunteer information for an article if he insists that the article be dignified and in good taste and, insofar as possible, he sees that the article as published carries out his instructions; (3) should discourage publication of an article where he knows in advance that it is to be sensational, undignified or may be construed to be advertising and should give no aid to *268 its preparation; and (4) in the ultimate the question of observance or infringement of the Canon is to be tested by good taste and good faith.
I agree with the principal points stated in the above cited opinion for I feel that they are consistent with the words and intent of Canon 27. However, I do not believe that the opinion defines with sufficient explicitness the responsibility of an attorney who submits to an interview or otherwise assists in furnishing material or comments for an article concerning his professional life and work.
The clear intent of the pertinent portion of Canon 27 is to prohibit an attorney from doing or saying anything which, either, directly or indirectly, constitutes or may reasonably have the effect of constituting a seeking of professional employment or of impressing the public mind with the idea that the lawyer because of his self-announced abilities, successes or organization is one that should be employed in preference to others in the profession.
Were it not for the prohibitions of this Canon lawyers could, and no doubt would be forced to, engage competitively in advertising of all kinds in which each would seek to explain to the public why he could serve better and accomplish more than his brothers at the Bar.
Susceptible as we are to advertising the public would then be encouraged to choose an attorney on the basis of which had the better, more attractive advertising program rather than on his reputation for professional ability.
This would certainly maim, if not destroy, the dignity and professional status of the Bar of this State.
While it is true that the pertinent portion of Canon 27 is not well constructed when the intent thereof is applied to the words its interpretation is not difficult.
It first condemns as unprofessional any solicitation of professional employment "* * * by circulars, advertisements, through touters or by personal communications or interviews not warranted by personal relations." (emphasis added)
While this first sentence of the Canon seems, because of the sentence which follows, to be concerned principally with direct action of an attorney it is not so limited and it must therefore be construed to prohibit any direct or indirect solicitation of professional employment through the means designated including "interviews not warranted by personal relations." I assume "personal relations" to mean the relation of attorney and client.
The second sentence of the Canon is more limited in that it deals specifically with indirect advertisement for professional employment.
This sentence condemns all indirect advertisement and then specifically mentions several types of actions which must be considered to be classified as indirect advertisement and therefore prohibited. The actions specifically prohibited by an attorney are:
a. Procurement of publication of his photograph in connection with a cause in which he is or has been engaged.
b. Furnishing or inspiring newspaper comments concerning the manner of conduct or magnitude of the interest involved in causes in which he is or has been engaged.
c. Furnishing or inspiring newspaper comments concerning the importance of the lawyer's position.
d. All other like self-laudation.
Thus it seems clear to me first, that the Canon considers the procurement of publication of his photograph and the furnishing or inspiring of newspaper comments on matters pertaining to his practice of law as self-laudation. It condemns these acts specifically and also prohibits all other like acts, i.e. all other self-laudation.
I interpret the applicable portion of Canon 27 not to prohibit an attorney from *269 submitting to an interview at the request of a representative of news media. However, I construe it to mean that if he does submit to such an interview or otherwise furnish information to news media at its request he must, in order to comply with the Canon, safeguard himself and his profession by refusing and refraining from furnishing any information or comments regarding his legal practice which if published could reasonably be construed to be and have the result of an advertisement for professional employment.
Further, I construe observance of the Canon to require an attorney who submits to such an interview, or furnishes information regarding his legal practice to request and be given the privilege of reviewing any such matter before it is published, and if he fails to do this prior to submitting to such an interview or furnishing such material and the article as published offend the Canon he must be held to subject himself to disciplinary action for violating the Canon.
This placing of the responsibility on an attorney for publication of offensive materials which are based upon information or comments furnished or inspired by him is essential if any observance of the Canon is to be had.
As pointed out by the Bar in its brief the observance of the Canons is the responsibility of the members of the Bar, not the news media.
If the publication of ethically offensive materials and comments flowing from an attorney are to be stopped or controlled it must be done at the source, i.e. the attorney involved.
In the foregoing interpretation of the Canon I have made a distinction between the publication of matter pertaining to practice of law and other aspects of a lawyer's life.
To prohibit the furnishing of information concerning the activity, accomplishment, service and success of a lawyer in public service, fraternal, business and civic affairs, unconnected with the practice of law would be to go beyond the obvious intent of Canon 27.
The construction which I give to the second sentence of the first paragraph of the Canon is in my opinion directly supported by the clear and unmistakable language of the second paragraph of the Canon. This paragraph clearly limits the information which a lawyer may publish in reputable law lists to bare biographical facts thereby prohibiting any statements, however factual, regarding size, success, speed with which cases are handled, investigative staffs or other services which the lawyer or firm may in fact be prepared to offer.
If the Canon prohibits the furnishing of such information for publication in law lists, which are used primarily by lawyers, certainly it intends to prohibit the furnishing of such information to the press for general publication.
Mr. Drinker, the most respected writer in the field, makes the limitation of the Canon clear, saying at p. 260 of his work on Legal Ethics (1953):
"A law firm may not acquiesce in the publication by a magazine of a laudatory history of the firm."
Having given my interpretation of the Canon I return to the case at hand.
I agree with the Bar that the complaint charging self-laudation was sufficient to charge a violation of Canon 27 and that the evidence was sufficient to prove the charge.
I cannot agree with the contention of respondent that he fulfilled his responsibility under the Canon when, at the end of the interview, he requested the reporter to allow him to review the article before publication and requested the article be written in good taste, dignity and in keeping with the standards of the legal profession.
If this contention were sound, as the majority opinion holds it is, then any lawyer who is sought out by any news media *270 can say anything which he chooses and insulate himself from the prohibitions of the Canon by simply requesting the right to edit the material and requesting that the writer make it conform to the Canon. This, in my opinion, would remove the responsibility for observance of the Canon from the members of the Bar and seek to place it on the news media which are not in anywise bound to observe the rules of conduct which are imposed on lawyers.
As I view this case the respondent simply made an error. This error might well have stemmed from a misinterpretation of the Canon which is understandable. It was compounded by a failure to anticipate the use which the reporter might and did make of the answers and information furnished by respondent. I am confident that had respondent realized that the information he furnished would have been used as it was and attributed to him as direct quotations he would not have submitted to the interview. His last error was to leave to the reporter the responsibility of making the article conform to the Canon.
Further, the record shows that the tone, "slant", contents and all the quotes attributed to respondent by the article were determined wholly by the reporter not by respondent. This it seems to me makes it clear that respondent was guilty of no intentional violation of the Canon and was guilty only of a mistake in interpretation and judgment.
Here I must add that what happened in this case demonstrates the absolute wisdom and necessity of requiring that an attorney who submits to an interview with the press be circumspect in furnishing information and comments and that he, at the outset of the interview, reserve the right to edit the article before it is published if there be any reasonable doubt of the use to be made of the material.
A private reprimand as I understand it simply advises a lawyer that he has breached a Canon of Ethics and calls upon him not to do so again. It should be used in those cases where the breach is minor, made unintentionally through mistake, inadvertence or ignorance of the Canon or its proper meaning, and where the violation involved does not relate to moral turpitude, criminal acts or the rights of clients.
A private reprimand should be employed, not for the purpose of disciplining or punishing a lawyer, but rather to assist him in observing the Canons of Ethics.
That this is the proper nature and use of a private reprimand is supported by the fact that the Integration Rule of The Florida Bar, which authorizes it, provides that an order of the Board of Governors adjudicating a private reprimand is never filed in this Court, never becomes a matter of public record and at all times remains confidential between the Board and the attorney involved unless brought here for review by the attorney involved.
On the other hand an order of the Board adjudging a public reprimand is required to be filed in this Court and becomes a public matter.
Thus in this case had the Board of Governors followed the recommendation of the referee, as I would do, and ordered a private reprimand this matter, unless appealed by respondent, would have ended there as a confidential advisory to respondent to be more circumspect in future dealings with the press.
I recognize that in view of the turn which this cause has taken and the inordinate amount of publicity given to it that it can never be returned to the position where it should have been laid to rest, i.e. as a confidential advisory between the Board and the respondent. This is unfortunate for all concerned, particularly the respondent. But it should not prevent this Court from properly deciding this case as it should have been decided, not should it lead us to establish a precedent which can only result in harm to the profession.
The private advisory, which I favor, could not and should not be considered as a *271 blot on respondent's escutcheon, his character, reputation or standing as a member of the profession. I recognize, as does the majority opinion, that he has an excellent reputation as a member of the profession and that he has made major contribution to it.
To make clear my feeling of the effect of a private reprimand, I feel safe in saying that the writer, most lawyers and many members of the bench, have on some occasion committed an error of degree similar in gravity to that involved here. The difference is that in most cases the errors have gone unnoticed while respondent's did not.
While not discussed in the majority opinion, I think the issue raised and argued by the press through an amicus curiae deserves brief answer.
The amicus curiae contended that if this Court construe the Canon to require an attorney to either reserve the right to review an article based on an interview with, or material furnished by, him or refuse to submit to an interview or furnish such data, such holding would constitute an infringement on and a violation of the freedom of the press.
The freedom of the press is not in any way involved in this cause. Only the freedom of action of an attorney under the Canons of Ethics is at issue.
As I interpret the Canon involved it does restrict an attorney in furnishing comments and material to the press under certain conditions.
However, the constitutional guaranty of freedom of the press does not guarantee press media that a member of the Bar, or any other citizen must submit to an interview or furnish information to them. The guaranty relates only to the right of the press to publish news.
The restriction which I interpret Canon 27 to impose on lawyers no more infringes on the freedom of the press than the rule which prohibits a lawyer from publishing confidential matters of his client.
Nothing I have said could be construed as prohibiting the press from publishing about an attorney anything which it might publish about any other member of the public. Nor is the right of the newspaper to publish the article here involved at issue. The newspaper had the constitutional right to publish the article as it did.
I am confident that neither the legal profession nor the press would purposely flaunt or encourage a violation of the ethics of the other. The bare fact, however, is that neither group is bound to observe the ethics of the other.
This was clearly explained by Mr. John McDermott, a highly respected, able member of the press, who before the referee testified that:
"* * * You (the Bar) abide by your Canons and we (the press) go by what we consider as right in our profession. We are not bound by the rules of your profession."
This fact demonstrates the necessity, as I would do, of placing the responsibility of complying with Canon 27 on the members of the Bar, not leaving it to the press.
Nothing in my opinion is intended to be critical of The Miami News, or its reporters. The article in question is a well written interesting story about a newsworthy person.
In conclusion I would point out that the majority opinion, on page 259, states that lawyers do and may properly build an office building, invite the public to come into and view it and have the whole affair written up in the press. I am not aware that this is the common practice of lawyers in this state and I do not agree that it would be proper for a lawyer to invite the public to call upon him to inspect his facilities.
Second, the majority opinion cites the books written by Mr. Nizer and others in support of its holding. I know of no approval given by the American Bar Association *272 or any other Bar to the works cited, and the majority opinion does not indicate that the action of the lawyer-authors has been approved. The critical fact is that the authors of these works are not before us charged with any violation of the Canons and I, for one, do not feel the propriety of their action is subject to decision here. Further, until such writings are determined by a proper authority to be proper under the Canon their mere existence cannot be cited as authority for their propriety.
I concur in that portion of the majority opinion which quashes the judgment or recommendation of the Board of Governors holding that a public reprimand should be administered to respondent for the reason that I believe that only a private advisory or reprimand is warranted under the facts of this case. I dissent from the remainder of the majority opinion.

ON PETITION FOR REHEARING
PER CURIAM.
On petition for rehearing counsel for The Florida Bar urge the court to reconsider the following language appearing on page 5 of the opinion in this cause as follows:
"It is common practice now for lawyers, doctors, farmers, business men and others to build nice homes, office buildings, business and professional buildings, give a grand opening, invite the public and get the whole affair written up in the paper with pictures of every detail of it. When a lawyer does this and permits the affair to be described and published as news in a single issue of the paper, we see no basis to charge him with violating Canon 27."
The court has considered the petition for rehearing and the reasons therefor and has revised the said language to read as follows:
"It is common practice now for lawyers, doctors, farmers, business men and others to build nice homes, office buildings, business and professional buildings. When a lawyer does this and permits the fact to be described and published as news in a single issue of the paper, we see no basis to charge him with violating Canon 27."
The petition for rehearing is accordingly granted and the objectionable language amended to read as stated.
In all other respects the petition for rehearing is denied.
ROBERTS, C.J., and TERRELL, THOMAS, DREW, THORNAL and O'CONNELL, JJ., concur.