In the Matter of JOHN E. CONNELLY, JR., PAUL J. CHASE, JOHN L. O'DONNELL, HARRY F. WEYHER, and Three Others, Attorneys, Respondents. ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK et al., Petitioners.

First Department, May 14, 1963.

*Eric Nightingale* of counsel (*John G. Bonomi* and *Daniel Shientag*), for petitioners.

*Samuel M. Lane* of counsel (*John V. McCann* with him on the brief; *Casey, Lane & Mittendorf,* attorneys), for respondents.

*Per Curiam.* This is a disciplinary proceeding brought in this court pursuant to the provisions of subdivision 2 of section 90 of the Judiciary Law. Named as respondents, among others, are John Edward Connelly, Jr. (admitted to the Bar December 24, 1930 in the First Department), Paul J. Chase (admitted to the Bar June 30, 1943 in the Second Department), John Logan O'Donnell (admitted to the Bar March 31, 1943 in the Second Department), and Harry F. Weyher (admitted to the Bar March 20, 1950 in the First Department). These persons were, at all the times hereinafter mentioned, and are now members of the firm of Olwine, Connelly, Chase, O'Donnell & Weyher. They are charged with professional misconduct in their violation of the following canons of the Canons of Professional Ethics of the New York State Bar Association, viz., canon 27, Advertising, Direct or Indirect, canon 29, Upholding

the Honor of the Profession, and canon 46, Notice of Specialized Legal Service, in that:

" 1. The respondents aided and cooperated in the preparation, and acquiesced in the publication of an article entitled " Behind the Scenes Tour of Today's Legal Labyrinths: Lawyers Who Try Not to Try Cases " by Maitland Edey, " Life ", March 9, 1962.

" 2. The article in question had the purpose or effect of advertising the services of respondents and their associates, of improperly giving notice of specialized legal services, of touting such services, and of calling attention to the magnitude of causes in which respondents have been engaged and to the importance of respondents' positions.

" 3. The aid and cooperation of respondents in the preparation of said article and their acquiescence in its publication were inconsistent with their duty to uphold the honor and to maintain the dignity of the profession in that such publication offended the traditions and lowered the tone of the profession."

The charges were referred to Hon. J. LEE RANKIN, as Referee, to take the evidence and report the same, with his opinion, to this court. Following hearings and the due completion of proceedings before him, he has rendered a very fair and comprehensive report, finding that the said *LIFE* article, mentioned in the charges, " had the purpose or effect of advertising the services of respondents or their associates, of touting such services, and of calling attention to the magnitude of causes in which respondents had been engaged and to the importance of respondents' positions. I also find that the aid and cooperation of respondents in the preparation of said article and their acquiescence in its publication and their failure to request the exclusion of self-laudatory portions were inconsistent with their duty to uphold the honor and to maintain the dignity of their profession and that such publication offended the traditions and lowered the tone of the profession." The Referee concluded that " the respondents and each of them were guilty of professional misconduct within Judiciary Law Section 90 (2) and violations of Canon 27, Advertising, Direct or Indirect, and Canon 29, Upholding the Honor of the Profession, of the Canons of Professional Ethics ".

The matter is now before this court on a motion to confirm the said report of the Referee.

As specified, the charges of professional misconduct made against the respondents, were grounded upon their alleged violation of canons 27, 29 and 46 of the Canons of Professional Ethics. These canons are among the 47 canons which were

adopted in 1909 by the New York State Bar Association as a "general guide" for attorneys to the end that "the conduct and the motives of the members of our profession are such as to merit the approval of all just men." (See Preamble.) Similar canons have been adopted by the American Bar Association. Promulgated in furtherance of the interests of the Bar and of the public, they represent a codification "in convenient form [of] the traditions and practice that have been recognized over the centuries as part of the common law with respect to the lawyer's obligations to the courts and the administration of justice, to the public and his clients, and to his profession and his fellow practitioners." (*Matter of Rothman,* 12 N. J. 528, 535; Ann. 39 A. L. R. 2d 1055 *et seq.*) While not possessing the force and effect of statutes, the canons have come to be recognized by the Bench and Bar as establishing wholesome standards for professional conduct. (See *Matter of Cohen,* 261 Mass. 484, 487; *Herman* v. *Acheson,* 108 F. Supp. 723, 726; *People ex rel. Chicago Bar Assn.* v. *Berezniak,* 292 Ill. 305.) · Consequently, lawyers are expected to follow faithfully the dictates of these canons, and any substantial breach thereof is considered as professional misconduct which may be the subject of disciplinary action in accordance with the provisions of said subdivision 2 of section 90 of the Judiciary Law. (See *Matter of Neuman,* 169 App. Div. 638, 641; *Matter of Schwarz,* 175 App. Div. 335, 344; *Hunter* v. *Troup,* 315 Ill. 293; *People ex rel. Chicago Bar Assn.* v. *McCallum,* 341 Ill. 578.) And there are a number of decisions, though not at all in point on the facts, holding that a violation of canon 27 in the furnishing or inspiring of newspaper comments, photographs or articles, constitutes grounds for disciplinary action. (See Ann. 39 A. L. R. 2d, p. 1067.)

Here, as we shall see, the actions and conduct of the respondents were in such clear disregard of the directions of the canons, and, in particular, of canon 27, that this proceeding is well grounded. Said canon, in its wording (first par.) material to the charges here, is as follows:

" 27. *Advertising, Direct or Indirect*

"It is unprofessional to solicit professional employment by circulars, advertisements, through touters or by personal communications or interviews not warranted by personal relations. Indirect advertisements for professional employment such as furnishing or inspiring newspaper comments, or procuring his photograph to be published in connection with causes in which the lawyer has been or is engaged or concerning the manner of

their conduct, the magnitude of the interest involved, the importance of the lawyer's position, and all other like self-laudation, offend the traditions and lower the tone of our profession and are reprehensible; but the customary use of simple professional cards is not improper.''

The gravamen of the charges, as in violation of said canon 27, is that the respondents' participation and acquiescence in the publication of the *LIFE* article '' had the purpose or effect of advertising the services of respondents or their associates, of improperly giving notice of specialized legal services, of touting such services, and of calling attention to the magnitude of causes in which the respondents had been engaged and to the importance of respondents' positions.'' Clearly, if the purpose and effect of the respondents' conduct were as charged, this would constitute '' indirect advertising '' prohibited by said canon.

The said *LIFE* article was originally planned by the editors of *LIFE* as one to cover the practice of corporate law in New York City as practiced by medium-sized law firms. The thought in the first instance was that it would deal generally with such practice as conducted by a number of these firms. With this thought, and for the purpose of obtaining material for the article from the respondents' firm, an editor of *LIFE*, a writer, and a counsel for the magazine, met early in 1959 on two or three occasions with the respondent O'Donnell. Included in their talks, was a discussion of ethics and O'Donnell specifically requested that he should have an opportunity to see the article before publication. The representatives of the magazine tentatively agreed to this but it was understood that the magazine would be '' final arbiter '' as to what would be published. In April, 1959, O'Donnell caused to be circulated throughout the office a memorandum to all the personnel of the firm, inviting such personnel, including associates and clerks, to discuss freely with *LIFE* representatives the work of the firm and any and all of its operations, excepting confidential information. Thereafter, the writer, who was to do the article, spent some time in the office gathering material and, in this connection, he interviewed certain of the partners and their associates and certain employees of the firm.

A copy of the first draft of the article was shown to respondents O'Donnell and Chase in July or August of 1959 and photographs of members of the firm were taken for use with the article. For two years thereafter, however, the project lay dormant, and the writer considered the story dead. The matter, however, was revived in January or February of 1962, a new

writer was assigned, the drafts were revised, and, after certain of the drafts were shown to the respondents or some of them, the article was published in *LIFE* on March 9, 1962.

The article, as it was developed and as published, instead of dealing generally with the practice of corporate law as conducted by medium-sized law firms in the City of New York, became a story chiefly of the make-up, work and activities of respondents' firm. O'Donnell admitted that there came a time when he knew that his "firm was going to be featured in the article"; that it would be "hung on his firm".

The responsibility of the respondents for "furnishing or inspiring" the particular portions of the article, which are hereinafter referred to, is not subject to doubt. Concededly, much of the material and details were obtained by the writer directly from the respondents, their associates and their employees. From time to time, O'Donnell, and, also, the other respondents on occasions, saw certain of the proposed drafts for the article, and they suggested changes and revisions therein. O'Donnell, in February, 1962, just before publication, saw and approved the final draft. The article, as published, follows this draft except for the addition in the published article of the title and a cartoon border around the first two pages, the addition of subheadings and the addition of the comment to the effect that the respondents' firm was "relatively new to the elite group" of "blue-chip" firms in New York City (naming some) which "splits the cream of corporate businesses".

The partners Connelly, Jr., and Weyher also saw the February, 1962 draft. Connelly said he "had hoped to discuss certain items with Mr. O'Donnell or one of the other partners who could convey my thoughts to Mr. O'Donnell", but did not do so. Weyher testified that he made some comment to O'Donnell and then left it to him. O'Donnell testified that nothing in the final draft, which he saw, was published over his objections. The fact is that the publishers had taken out such material in the composition as O'Donnell objected to, and he testified that he was "quite pleased" with the final draft which he saw.

The article, as published, opens with the statement that "Wherever a man turns these days and whatever he does, he is likely to find himself confronted by a tangle of law". Then, later on, in its opening paragraphs, there is the comment that "virtually everybody nowadays has to deal with lawyers at one time or another in one way or another"; and then it purports to lead up to a discussion of what the "corporation lawyer" does. There is the statement that "the corporate

lawyer's specialty is big-city business deals. But besides this (unless he is a specialist) he handles wills, the sale of properties, contracts, individual agreements and divorces." Then, it is written, that, among the group of firms " which splits the cream of the corporate business " as " relatively new to the elite group, and smaller than most, is the firm of Olwine, Connelly, Chase, O'Donnell & Weyher. Last year the Olwine partners grossed roughly $1 million. The ways in which the firm's fees mounted up to that impressive total provide effective insight into the legal labyrinths that surround American business in today's complex society."

Then, the article (which in all contains about 5,000 words) continues in the main to discuss in some detail the practice and certain activities and affairs of the respondents' firm. Undoubtedly, as claimed by respondents, the article was thereby intended to portray the operations of a medium-sized law firm, engaged chiefly in corporate practice in New York City, using respondents' firm as an example, but the result was an article, which as written and published, featured and extolled the personalities and activities of the respondents' firm.

The article is replete with material which canon 27 says a lawyer shall not furnish or inspire, to wit, material concerning the " causes in which the lawyer has been or is engaged or concerning the manner of their conduct, the magnitude of the interest involved, the importance of the lawyer's position ". For example, there is the following material, the publication of which was approved or acquiesced in by the respondents, to wit:

" John Logan O'Donnell was in court. ' This is a routine matter,' he explained to a friend sitting with him in New York City's U. S. Court House. ' An employe of one of our clients was killed in a plane crash a while back, and his widow was paid $86,000 in compensation by our client company. Now she is suing the airline and the plane manufacturer for negligence. If she wins her suit, the company can get its money back — provided I can get the client into the case as a co-claimant. My motion this morning will be a request to get in.'

\* \* \*

" At about the same moment, uptown in the offices of O'Donnell's New York City law firm, his partners were probing a diversity of legal problems. Paul Chase was putting the final touches on a $4 million corporate reorganization. Harry Weyher was figuring out how to get the largest possible tax loss for a manufacturing concern which was owed a lot of money it could not collect from a Philippine subsidiary. In the office next to

him a third partner, John Connelly, was involved in the sale of a large Manhattan hotel. Down the hall * * * was handling registration of a stock issue for a food company. * * * was immersed in the ramifications of a price-fixing case.

" The details of their work were obscure. The very language they used, rich in the precise circumlocutions of the law, was arcane. But the importance of their activities on behalf of their clients may be measured against a practical, if gross, yardstick — specifically, money. For completing the corporate reorganization, the firm would earn $25,000; for the tax-loss advice, $500; for counsel in the hotel sale, $3,000; for the stock registration, $15,000; for the initial work in the price-fixing case, a preliminary fee of $800; and for John O'Donnell's four minutes in court, to which 28 hours of preparation were devoted, $1,100.

\* \* \*

" Enhancing the abilities of the Olwine partners in earning such fees is the firm's extensive staff. Like all corporate law firms, Olwine is divided into three working echelons: partners, associates, and others — the others being secretaries, clerks, typists, messengers, librarians. The partners run the business, conduct the cases, deal directly with the big clients, and split the profits. The associates are younger men who are fresh, or reasonably fresh, out of law school. They do the painful detail work and are paid salaries ranging from a high of $20,000 a year down to $140 a week.

\* \* \*

" There are six partners in the Olwine firm * * * The active Olwine partners are, typically, a well balanced but diverse group of characters.

" John Connelly, the oldest (58), is a silver-haired faultlessly dressed man with a courtly manner. He specializes in real estate. Almost all of his time is spent helping people to buy buildings, rent buildings, sell buildings, mortgage buildings, build or tear down buildings, buy or sell land on which to build buildings, or protect themselves against people who fall down in buildings.

" Paul Chase is a quick-witted, restless, soft-spoken man of 46. He arranges mergers, stock issues and acquisitions of other companies. He negotiates contracts and licensing agreements, and is constantly available as an adviser to clients on how to operate within the web of corporate laws.

" John O'Donnell, 48, is the trial man. All the problems of all the partners, when negotiations fail, are turned over to him to defend or prosecute in court. A serious, moon-faced gentleman,

he studiously maintains an attitude of conservative responsibility. He is necessarily an expert on judges and juries, and tries to keep book on the legal and personal idiosyncrasies of judges—'the way a big-league pitcher keeps book on batters,' so he can, if possible, exploit their quirks. He must also make himself an expert overnight on whatever subject his case is about, whether it be corporate regulations in Bolivia or the potential for damage of an insect that inexplicably gets into a can of food.

"Harry Weyher, 40, is the tax expert. Tall and dark, he has a gentle voice which contains traces of his North Carolina upbringing. Weyher's cases are likely to be large and incredibly complicated. His opponent is usually government, since corporations are constantly engaged in disputes with federal and state authorities over income tax declarations.

\* \* \*

"With the \* \* \* partners, 19 associates and 28 clerical personnel, the law firm's roster is complete—except for the clients.

\* \* \*

"In the main, Olwine's clients are representative of a particular kind of American industrialism that has grown up in the past 20 years. These client companies are daring, confident, resourceful and very expansionist-minded. They diversify by merger, and acquire through corporate financing. This approach to growth requires constant legal advice of the highest caliber. Here, for a resourceful young law firm, lies today's great opportunity: helping ambitious, modern-style businessmen pick their way through the jumble of the American corporate boiler room without getting burned.

"One example of the type is William H. Husted, a lean intense man in his 40s who describes himself occupationally as a corporate entrepreneur. \* \* \* he came to the Olwine firm. \* \* \* he was preparing to launch a big and fragile financial bubble.

"'This one was pretty complicated,' says Paul Chase, who ultimately handled the whole thing for Husted. 'I'm not sure a layman can understand it.'

"'Nonsense,' says Harry Weyher, who has a tax lawyer's special view of complexity. 'It was really very simple.'

\* \* \*

"After eight months of meticulous legal footwork, the deal finally went through one morning in the board room of the bank.

Thirty men were present. The trailer people from Alabama were there with an accountant and two firms of lawyers. Allied was there with its lawyers. The underwriters of the new stock issue were there with their lawyers. The bank executives were there with their lawyers. The insurance company was there with its lawyers. And Husted was there with the three Olwine lawyers.

\* \* \*

"Paul Chase had prepared a 43-page, typed agenda which described in order the 166 necessary steps. Each group had its own pile of papers in front of it. As the morning wore on, copies were handed around to the other groups in an organized chaos of examination, stamping, signing, notarizing and filing. When the activity finally ended, each group was in possession of a set of documents entirely different from those with which it had started. Several checks of several million dollars had passed rapidly through several hands. Husted and his associates, on a total investment of $80,000, had an immediate paper profit of more than $900,000. Olwine's fee for its work in closing the deal and on related matters was $35,000.

"The Husted operation is just one dramatic example of the corporate work that absorbs the energies of Olwine lawyers. But much of the firm's practice also springs from the conflicts, aspirations and disasters of individuals. The firm has defended persons accused of perjury, forgery and tax evasion.

\* \* \*

"Most of the individual business comes through corporate clients, for corporations have officers and employes, and the officers and employes have personal problems.

\* \* \*

"The firm's willingness to do divorce work itself rather than refer such cases to specialists is unusual for a blue-chip practice. Most corporate law firms won't touch divorce cases.

\* \* \*

"Olwine's partners view divorce cases as an inescapable part of modern law practice. Senior Associate \* \* \* handles them as the firm's divorce specialist. A cheerful and highly articulate man, he has strong ideas about his specialty:

\* \* \*

"An example of [this associate] the tiger in action was provided a few days later. He had been retained by a young businessman whose marriage was on the rocks. The wife

agreed to a separation. Unfortunately for the man, his wife's price for agreement was $20,000 in cash.

\* \* \*

" After a protracted argument, during which [this associate] drove the other lawyer's fee down from $5,000 to $1,500 (the husband usually has to pay both lawyers' fees), the other attorney agreed and addressed himself to selling the idea to the wife. In due course the four parties met to sign a separation agreement. Paragraph by paragraph the agreement was discussed: the terms of the monthly payments, division of personal property, settlement of wills and estates in case either party were to die, payment of current bills.

\* \* \*

" In the last analysis, a lawyer has nothing more material to sell than his time. Most corporate law firms, and Olwine is no exception, keep a time sheet on each case they handle. Every lawyer in the firm has a pad on his desk, and every hour of the day, or fraction thereof, including time spent on the phone on behalf of a client, is accounted for. The charge averages $40 an hour for a partner's time, up to $20 for an associate's time. As a result, a good many Olwine clients prefer to talk to Olwine associates. They know that a good deal of the work is going to be done by the associates anyway. This is beneficial in two ways. It keeps the partners free of tedious detail, and it adds to the associates' sense of responsibility.

" Last year the Olwine partners took home an average of $40,000 apiece before taxes. Considering their experience and ability, the private lives they are expected to lead, the hard work they do and the great responsibilities they carry, these earnings, in this day of high personal income taxes, are not really remarkable. \* \* \* "

True, for the purposes of this opinion, we have taken the aforesaid material out of context, but the fact is that there is nothing in the composition, considered as a whole, to detract from the objectionable effect of such material as the portrayal of certain causes which the respondents' firm has been engaged in, the manner of conduct of the same, the magnitude of the interests involved, and the importance of its position in the practice of law.

Moreover, as tending to make the article more personal and specific as a treatise of the affairs of the respondents' firm, the photographs of the members thereof are published with the article. The respondents posed for these photographs in furtherance of and for use with the article. The publication of the

same, considered with the text, clearly violates the provisions of said canon 27 which proscribes the procuring by a lawyer of a publication of his photograph " in connection with causes in which the lawyer has been or is engaged or concerning the manner of their conduct ". Furthermore, certain of the captions thereunder, which were read to and approved by the respondent O'Donnell, contain material tending to emphasize " the magnitude of the interest involved " in causes which these lawyers would handle and " the importance of (their) position ". For instance, under O'Donnell's picture there is the caption, " Trial expert John O'Donnell, 48 and a Northwestern Law School graduate, is the firm's last resort in a case. He takes over when all out-of-court negotiations fail and the client must go to court." Under Weyher's picture is a statement that he is " a specialist " guiding clients " through the complex maze of modern tax laws " and that his " expert advice at an average of $40 an hour can save a big corporation millions of dollars." Then there is the statement under the picture of an associate of the firm, published with the article, that, as a " divorce specialist," he " goes all out to avoid trial."

So, as we have demonstrated, the article does contain considerable material and detail purporting to show the magnitude of the interests handled by this particular firm of attorneys and the importance of its position in the New York City law practice. Thus, on its face, the article as published, clearly supports the charges of violation of canon 27. But the respondents claim to justify their participation and acquiescence in the publication upon the ground that the project and article represented no more than a newsworthy presentation of a subject of public interest and that the material detailing their activities and respective causes as lawyers was merely incidental to such a presentation. In this connection, they say that their actions were in fact in good faith and not in bad taste. They cite the recent case of *State of Florida ex rel. The Florida Bar* v. *Nichols* (151 So. 2d 257 [Fla.]). This case is very helpful but not controlling here. As therein indicated, each case of alleged professional misconduct in connection with a newspaper or magazine article, must be independently judged in the light of the context of the particular article and the lawyer's participation in furnishing the material for and in the publication of the same.

That the *LIFE* article was an example of well-written legitimate journalism from the viewpoint of the publisher is not decisive of the question here. The freedom of the press or the right of *LIFE* to publish the article is not at issue. The press

is not bound by the Canons of Professional Ethics but, for very good reason, attorneys are. So, in the final analysis, it is immaterial that the personal and laudatory material and detail are well adapted to the purposes and the theme of the particular article.

We agree, however, that, where a newsworthy or public interest article, published in a newspaper or magazine, is in good taste, a charge of a violation of canon 27 is not necessarily made out merely by proof of a lawyer's co-operation in the publication therein of certain of his activities or achievements. (See *State of Florida ex rel. The Florida Bar* v. *Nichols, supra.*) As pointed out in Opinion No. 806 rendered by the Committee on Professional Ethics of the Association of the Bar of the City of New York, on May 2, 1955: " the press and the public have a proper and legitimate interest in newsworthy incidents in the career and activities of a lawyer ". But therein the attorney is also warned that " [h]e may not properly encourage laudatory statements in newspapers and magazines as to his professional attainments or collaborate in their preparation ", and that " [i]t would be the duty of a lawyer to discourage the publication of an article where he knew in advance that it was sensational or undignified, or might be construed as advertising, and he should give no aid in its preparation."

Broadly speaking, the question is said to be one of professional good faith and good taste. (See *State of Florida ex rel. The Florida Bar* v. *Nichols, supra,* citing Drinker, Legal Ethics, p. 260.) We agree, but, in this connection, however, the alleged good faith of the attorney must be judged in the light of " the objective nature of his conduct and the quality of his act." (See *Matter of Gould,* 4 A. D 2d 174, 175.) There can be no justification for the participation and acquiescence by an attorney in the development and publication of an article which, on its face, plainly amounts to a self-interest and unethical presentation of his achievements and capabilities.

Drinker, in his said treatise, correctly differentiates between what is right and what is wrong, stating: " Where publicity is the normal by-product of able and effective service, whether of a professional or non-professional character, this is a kind of ' advertisement ' which is entirely right and proper. * * * What is wrong is for the lawyer to augment by artificial stimulus the publicity normally resulting from what he does, seeing to it that his successes are broadcast and magnified. While in hypothetical cases it may often seem difficult to draw the line between what is right and what is not, actually, a lawyer soundly

brought up in the law, who wholeheartedly accepts his professional status, will rarely have any difficulty in realizing the difference between the normal by-product of efficient service and the unwholesome results of self-aggrandizement.'' (Drinker, Legal Ethics, pp. 218–219.)

Of course, the propriety of the lawyer's conduct, dependent, as it is, upon the special circumstances in each case, is to be judged on the basis of the nature and wording of the particular article, the occasion for and media of publication, and the nature and extent of his participation in the publication by the furnishing of material therefor or otherwise. All these factors are to be considered and viewed in the light of the settled purpose of canon 27 which is ''to maintain the honor and dignity of the law as an honorable profession.'' (*Matter of Gray,* 184 App. Div. 822, 828.) Then, in the final analysis, the inquiry is whether or not the particular news or magazine presentation, considered as a whole, and the conduct of the lawyer in connection with the development and publication of the same, were such as to have a tendency to undermine the canon.

Canon 27, in wording and in spirit, is clearly violated by conduct of an attorney which is plainly calculated to publicize the magnitude of the interests handled by him or, in any way, his special skills, capabilities or talents in the practice of law. Where, as here, there has been a deliberate encouraging or fostering by attorneys of self-interest publicity to be afforded by a news medium or magazine article, and the personal and laudatory aspects of the article have a tendency to promote their private interests, there is unquestionably a violation of the canon. These actions tending prominently to publicize the names of these attorneys and their special qualifications, constitute indirect advertising. They '' offend the traditions and lower the tone of our profession and are reprehensible '' (see canon 27), and require disciplinary action.

The responsibility for the professional misconduct here rests primarily upon the respondents who were members of the Olwine firm at the time of the initiation of the project. O'Donnell, who took over responsibility for the firm's participation in the publication, testified that he consulted his partners, and as he put it, the decision was one for the partnership. Therefore, it is clear that each of the partners who knew and acquiesced in the objectionable activities of the firm, is to be held accountable for the violation of canon 27.

The Referee concluded that the conduct of the respondents was also in violation of canon 29 which expressly provides that

lawyers " should strive at all times to uphold the honor and to maintain the dignity of the profession ". We agree.

The petitioners also charge that the conduct of the respondents amounts also to a violation of canon 46. It is the petitioners' position that the said canon should be given the effect of prohibiting any notice to the public generally concerning specialized services rendered by a lawyer. The Referee merely concluded that he did not find it necessary to apply that canon. Inasmuch as the canon by its terms purports to be applicable in the case of a lawyer rendering a specialized legal service " directly and only to other lawyers ", we conclude that the provisions of this canon do not expressly apply to proscribe the conduct of the respondents as here charged. It is canon 27 that is specifically applicable here.

Three certain other attorneys, who were not members of the respondents' firm but merely associates in the employ thereof at the time of the inception of the project, were made respondents and charged with misconduct upon the ground that they participated in the project to the extent of furnishing certain of the objectionable data for the proposed article. They had not been consulted with respect to the firm's participation in the project and it appears that they relied largely upon O'Donnell with respect to the question of ethics. In moving to dismiss, counsel for respondents said that he also moved separately as to each respondent because the incident of involvement of each differed markedly. The Referee agreed that there was a marked difference in the activity of each respondent concerning the publication but held that these three respondents were chargeable with professional misconduct in that the standard to which they were held in the public interest required that they should have protested even though it became a serious threat to their continuation with the firm. It does not appear, however, that a protest by any one of them, if made, would have been heeded. Furthermore, as distinguished from the case against the respondent partners, they may not be chargeable with responsibility for the over-all effect of the project and of the resulting publication. To the extent, however, that they did furnish material proscribed by canon 27, the proceeding was properly brought against them. Were this not a case of first impression, we would conclude that they, too, should be censured. Bearing in mind, however, that, comparatively speaking, their participation in the publication was in a minor degree, this court, in the exercise of the discretion vested in it, concludes that the proceedings shall be dismissed as to these three respondents.

Except as indicated herein, the Referee's report is in all respects confirmed.

The respondents John Edward Connelly, Jr., Paul J. Chase, John Logan O'Donnell and Harry F. Weyher should be censured for their professional misconduct in violation of canons 27 and 29, and the charges should be dismissed as to the other respondents.

McNALLY, J. (dissenting). I dissent from so much of the majority opinion as imposes censure. In my view the publication was an error of judgment on the part of respondents without wrongful or purposeful intent to violate the Canons of Professional Ethics. Since this is a case of first impression in this State (cf. *State of Florida ex rel. The Florida Bar* v. *Nichols*, 151 So. 2d 257 [Fla.]) in the light of the impeccable professional standing of respondents and in the absence of guilty intent, I would dismiss the proceedings with a warning to the Bar that a repetition of like conduct in the future by any attorney will be deemed sufficient basis for appropriate disciplinary action. (See *Matter of Anonymous*, 274 App. Div. 89; *Matter of Bermant*, 256 App. Div. 944.)

BOTEIN, P. J., BREITEL, RABIN and EAGER, JJ., concur in *Per Curiam* opinion; McNALLY, J., dissents in opinion.

Respondents censured.