[L.A. No. 30601. May 3, 1977.]

LEONARD D. JACOBY et al., Petitioners, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

Andrew S. Garb and Robert N. Harris for Petitioners.

Fred Okrand, Jill Jakes, Mary Ellen Gale, Girardeau A. Spann, Alan B. Morrison, Gary Near, Jerome B. Falk, Jr., Howard, Prim, Rice, Nemer-ovski, Canady & Pollak, Irving F. Reichert, Jr., Laurence D. Rubin and John W. Starr as Amici Curiae on behalf of Petitioners.

Herbert M. Rosenthal, Stuart A. Forsyth, Scott J. Drexel and Robert E. Hinerfeld for Respondent.

**OPINION**

**MOSK, J.**—No issue in recent years has generated more controversy among members of the bar than the asserted right of attorneys to publicize their skills and services. And few aspects of the legal system have drawn more public attention than the mounting cost of legal assistance, particularly to middle income persons. The two concerns converge in this case, as we review a recommendation of the Disciplinary Board of the State Bar that petitioners Leonard D. Jacoby and Stephen Z. Meyers, the founders of a low cost legal clinic, be suspended from the

practice of law for 45 days primarily because they are alleged to have solicited clients through media interviews in violation of former rule 2 of the Rules of Professional Conduct.[1]

Petitioners contend, inter alia, that former rule 2 violates the First Amendment to the United States Constitution as incorporated by the Fourteenth Amendment.[2] We do not reach this broad contention, but hold rather that former rule 2 could not constitutionally be applied to prohibit an attorney from cooperating in the publication of a news article or broadcast on a newsworthy topic, even when the attorney himself is the subject. Accordingly, the proceedings must be dismissed.

The facts are not in dispute. Petitioner Meyers was admitted to the bar in 1967, and petitioner Jacoby in 1968. In 1972 petitioners opened a law office called the Legal Clinic of Jacoby and Meyers, in an avowed effort to provide low cost legal services to that large segment of the population unable to meet the indigency standards of legal aid programs but not affluent enough to retain most law firms. Petitioners instituted a number of cost-saving measures in the operation of their clinic, including extensive use of paralegal assistants and part-time specialists; charging a flat $15 initial consultation fee; location in a storefront rather than in a more traditional office building; and concentration on simple but recurrent legal problems susceptible of resolution by standardized techniques.

News of petitioners' plans attracted the attention of a statewide consumer organization president, who decided to publicize the legal

---

[1] Former rule 2 provided in relevant part that "A member of the State Bar shall not solicit professional employment by advertisement or otherwise.

"Without limiting the generality of the foregoing a member of the State Bar shall not solicit professional employment by . . . (2) Using a newspaper, magazine, radio, television, books, circulars, pamphlets, or any medium of communication, whether or not for compensation, to advertise the name of the lawyer or his law firm or the fact that he is a member of the State Bar or the bar of any jurisdiction; . . ."

The prohibitions against solicitation and advertising are now embodied in rule 2-101 and following of the Rules of Professional Conduct.

[2] The First Amendment declares in relevant part, "Congress shall make no law . . . abridging the freedom of speech, or of the press; . . ."

Article I, section 2, of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." This provision is "more definitive and inclusive than the First Amendment." (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116].) Hence, although for convenience we frequently refer throughout this opinion to the First Amendment, we base our decision equally on the terms of the state Constitution.

clinic concept. He hosted an open house at the clinic and invited representatives of the news media. Petitioners appeared and responded to questions.

Subsequently, petitioners participated in a number of interviews initiated by news reporters interested in the legal clinic scheme. A sample story resulting from one of these interviews is reprinted in the margin.[3] As there illustrated, the typical article recounted the difficulty of delivering low cost legal services to the middle class and examined some of the procedures used by the clinic to resolve that problem, often

---

[3]The following article appeared in Newsweek Magazine, November 20, 1972: " 'Laws grind the poor, and rich men rule the law.'—Oliver Goldsmith

"The poor still have their complaints about the law, but today's middle class is also feeling a little ground down. The problem is the high cost of attorneys. Too affluent to qualify for Legal Aid but too poor to afford the fees charged by many lawyers, the middle-class citizen often has to do without needed legal services. In an effort to make the profession more accessible, the American Bar Association is urging its 153,000 members to adopt more efficient office procedures that should result in better service at lower cost. Judging by the work of an unorthodox new storefront law firm in Van Nuys, Calif., such streamlining may pay off for the nation's forgotten clients.

"Known as the Legal Clinic, the firm was founded three months ago by two attorneys specializing in consumerism, Stephen Z. Meyers, 29, and Leonard D. Jacoby, 30. Operating much like a low-overhead retail business, the clinic cuts corners wherever it can. Most new clients are screened by a pair of 'paraprofessionals' (both law students), who handle such routine office procedures as research and filling out forms, thus saving the lawyers a good deal of time. The forms for a simple bankruptcy, for example, take about twenty minutes to complete. 'After the forms are filled in,' says Robert Poyourow, one of the screeners, 'the lawyer needs only three minutes or so to advise the client whether he should declare bankruptcy and, if so, have him sign the forms. It's simpler all the way around.'

"Divorce: In cases requiring litigation, the clinic uses another time-saving device: systems analysis. Each of the situations most common to middle-class clients—divorces, bankruptcies, personal injuries, landlord-tenant disputes and consumer suits—are dealt with in large, loose-leaf binders containing forms, codes, precedents and typical defenses. After the client is screened, the paraprofessional turns to the proper chapter in one of the binders and hands the lawyers a ready-made dossier.

"The fees for this supermarket service start with a $15 consultation charge. Flat rates for routine cases are generally well below those charged by other lawyers in the area. An uncontested divorce costs $100 (versus about $400), and an individual bankruptcy case costs $200 (compared with about $350)—making it possible for some people to clean up cases they previously couldn't afford to settle. Client Clifton Shepherd, 71, had been separated from his wife for 30 years but could not afford a $350 divorce. The clinic set him free for $100. For a $30 fee, it got housewife Mickey Ormond out of a $25-a-month contract for karate lessons, which she had discontinued for medical reasons. 'If the clinic hadn't existed, I'd have been forced to pay,' she says. 'People need something like the clinic to back them up.'

"The California Bar Association is not quite so sure. It has been looking into the publicity the clinic has received, which to some local lawyers smacks of unethical advertising. 'They're after us on the grounds of advertising and solicitation, but they're really worried about our restructuring of the legal profession and our lower fees,' claims Meyers. 'We're demonstrating,' he adds, 'that it *is* economically feasible to provide high-quality, low-cost services to the average person.' "

comparing fees charged by Jacoby and Meyers for certain standard services with those generally charged by more customary law firms.

Because of the open house, the interviews, and the use of the name "Legal Clinic," the State Bar initiated disciplinary proceedings against petitioners. Petitioners called a press conference to discuss the charges against them, and at the conference issued a press kit as background material for the media representatives. Included in the kit were an explanation of the purpose of the clinic and brief biographies of its staff attorneys; a comparative fee schedule setting forth the fees charged by the clinic and the former suggested minimum fee schedules of local bar associations; favorable responses from clients to questionnaires sent out by petitioners; letters of support from various attorneys and legislators; and copies of correspondence between petitioners and the State Bar. Petitioners subsequently gave additional interviews resulting in news articles similar to those already described, except that the later articles also reported the State Bar accusations. The State Bar then amended the allegations against petitioners to include charges based on the press kit and the later interviews.

At no time did petitioners pay for the publication of any of the articles written about them, nor are they charged with directly soliciting business from any identifiable client.

On these facts the local administrative committee found that petitioners' conduct in publicizing their legal clinic, the expertise of its personnel, and the fees they charge, was "principally directed" to generating business for their law firm. But the committee also found that "In doing so, [petitioners] honestly believed that the financial success of their said law firm was necessary to prove the practicability of the 'legal clinic' concept they claimed to have originated or been the first to implement."

The committee, by a two-to-one vote, concluded that petitioners violated former rule 2 both by their media contacts and by their use of the "assumed and/or misleading name" of the Legal Clinic of Jacoby and Meyers. The committee further concluded, however, that petitioners' conduct did not involve moral turpitude, dishonesty, or corruption. (Bus. & Prof. Code, § 6106.)

The disciplinary board adopted almost verbatim the findings and conclusions of the committee, and recommended that petitioners be

suspended from the practice of law for 45 days. Four members of the board dissented, and would have dismissed the charges.

As will appear, we are of the opinion that the finding that petitioners' conduct was principally directed to solicitation of clients, and the conclusion that it may therefore be proscribed under former rule 2, are not supportable in light of recent decisions of this court and the United States Supreme Court sharply restricting governmental regulation of constitutionally protected speech.

■ Before reaching the solicitation charges, we discuss briefly the allegation that petitioners practiced under an assumed or misleading name. This charge is based on section (a), subdivision (3), of former rule 2, which specified that the only permissible "sign" for a lawyer to use was one "disclosing his name or the name of his law firm, and the word 'attorney,' 'attorney at law,' 'counselor at law,' 'lawyer,' or 'law office,' or, if a patent lawyer, 'patent lawyer.' " Inasmuch as petitioners call their firm a "legal clinic" rather than a "law office," their conduct is arguably prohibited under a strict reading of the rule.

It is apparent, however, that this portion of rule 2 principally served the purpose of preventing deception, and the State Bar has not shown that the term "legal clinic" is in any sense deceiving. Indeed, nowhere in the State Bar's 210-page brief is the issue even mentioned. Viewing the matter without such assistance, we find it difficult to comprehend why "legal clinic" is more misleading than the permissible designation of "law office." In petitioners' circumstance, "legal clinic" may actually be more descriptive than "law office" because of the significant differences between petitioners' operation and a more traditional law practice. Certainly the use of "legal clinic" appears less misleading than the widespread custom of retaining in the title of a law firm the name of partners long since deceased.

The triviality of the misleading name charge against petitioners is further emphasized by two recent bar association developments. The American Bar Association (ABA) has announced it is funding an $80,000 "experimental, innovative legal clinic program for the delivery of legal services." (ABA press release, Oct. 3, 1975.) And the State Bar itself, in proposed new rules on advertising now under consideration, gives as an example of a permissible title for a law firm, "Legal Clinic of Doe and Roe." (Proposed rule 2-102, subd. (B)(3)(b).) Under these circumstances we conclude that petitioners have committed no professional misconduct

in entitling their office, "Legal Clinic of Jacoby and Meyers." We turn now to the solicitation issue.

Surprisingly, the precise question before us—whether a lawyer may be prohibited from participating in the preparation of a news article about himself—has rarely arisen in reported decisions. The two principal opinions on point have reached conflicting results in slightly different factual contexts. In *State* v. *Nichols* (Fla. 1963) 151 So.2d 257, a lawyer was interviewed for a newspaper article which described the success of his firm, stated that hundreds of lawyers referred negligence cases to the firm, and related what other attorneys and judges said about the lawyer. In addition, the attorney contributed several quotations praising the expertise of his associates and investigators. The Florida State Bar recommended that the attorney be disciplined for violating a canon prohibiting self-laudation; but the Florida Supreme Court, weighing the value of the news article as a whole against its self-laudatory aspects, exonerated the attorney. A contrary conclusion was reached by a New York intermediate appellate court in *In re Connelly* (1963) 18 App. Div.2d 466 [240 N.Y.S.2d 126]), which censured members of a law firm who cooperated in a Life Magazine article about the firm. Neither *Nichols* nor *Connelly* dealt at any length with possible First Amendment implications.

Three California disciplinary cases have involved lawyers and the press, but none is directly on point. In *Bushman* v. *State Bar* (1974) 11 Cal.3d 558 [113 Cal.Rptr. 904, 522 P.2d 312], we imposed discipline on an attorney who, among other offenses, sent numerous self-laudatory press releases to newspapers. In *Millsberg* v. *State Bar* (1971) 6 Cal.3d 65 [98 Cal.Rptr. 223, 490 P.2d 543], we publicly reproved an attorney for allowing a rental owners' association to advertise to its members his services as its attorney. The only California case to discuss the First Amendment aspects of the solicitation ban was *Belli* v. *State Bar* (1974) 10 Cal.3d 824 [112 Cal.Rptr. 527, 519 P.2d 575]. In an opinion which will be discussed more fully below, we held that certain self-laudatory communications sent by an attorney to the media were constitutionally protected because they were designed to increase business for a lecture series and educational seminars rather than to solicit clients, while other literature, including an endorsement of a brand of liquor, was properly the subject of discipline.[4]

---

[4]A recent case also discusses the validity of prohibitions on attorney advertising. In *In re Bates* (1976) 113 Ariz. 394 [555 P.2d 640], the Arizona Supreme Court censured two attorneys who took out *paid* advertisements for their legal clinic in a daily newspaper. In a divided opinion the court upheld Arizona's counterpart to rule 2 against constitutional

As none of the cited cases appears to be controlling, we proceed to analyze petitioners' contentions in terms of general First Amendment law. As in all instances in which a statute or governmental regulation is subjected to a challenge on such ground, if petitioners can show the recommended discipline infringes on First Amendment rights the State Bar will have the burden of demonstrating that the regulation in question is necessary to further a compelling state interest. (*N. A. A. C. P. v. Button* (1963) 371 U.S. 415, 438 [9 L.Ed.2d 405, 421, 83 S.Ct. 328].)

▮ The First Amendment protects the freedom of expression of all citizens, including lawyers. ▮ ▮▮▮Petitioners have a right not only to respond to questions from the media on important issues, but also a right to seek out the media to express their views.[5] ▮ Insofar as the present proceedings effectively inhibit petitioners from speaking their mind on an important issue—the delivery of inexpensive legal services to middle income persons—they infringe on important First Amendment rights.

Moreover, just as petitioners have a right to air their beliefs, society has a right to hear them. ▮ As the United States Supreme Court has consistently held, "the protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both." (*Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748, 756 [48 L.Ed.2d 346, 355, 96 S.Ct. 1817] [hereinafter *Board of Pharmacy*]; see also *Kleindienst* v. *Mandel* (1972) 408 U.S. 753, 762-764 [33 L.Ed.2d 683, 691-693, 92 S.Ct. 2576]; *Stanley* v. *Georgia* (1969) 394 U.S. 557, 564 [22 L.Ed.2d 542, 549, 89 S.Ct. 1243]; *Lamont* v. *Postmaster General* (1965) 381 U.S. 301, 308 [14 L.Ed.2d 398, 403, 85 S.Ct. 1493] (Brennan, J., concurring).) This societal interest runs to the heart of the First Amendment, a major purpose of which is to promote free discussion of governmental affairs. (*Buckley* v. *Valeo* (1976) 424 U.S. 1, 14 [46 L.Ed.2d 659, 684-685, 96 S.Ct. 612].) Among those affairs is the operation of the legal system. Yet particularly since the New York decision in *Connelly*,

---

and antitrust attacks. On October 4, 1976, the United States Supreme Court noted probable jurisdiction *sub nomine Bates* v. *Arizona State Bar.* (Docket No. 76-316.)

[5]Thus the argument between petitioners and the State Bar as to which communications were "initiated" by the press and which by petitioners is constitutionally irrelevant. The constitutional right of petitioners is the same in either event, as is the purported harm caused by the article; in either case, petitioners' offense, if any, is indirect solicitation of clients through the media.

Neither is it relevant that proceedings against petitioners did not become public knowledge until petitioners made them so. Although the State Bar has a duty to protect an attorney by keeping a pending investigation against him confidential (Rules of Proc. of the State Bar, rule 6.20), the attorney is not compelled to accept that protection.

the threat of discipline has in many cases deterred lawyers from talking to journalists, and hence has prevented laymen from learning important facts about the legal profession.[6] While this aura of secrecy may create a mystique about lawyers, surely it is preferable to encourage freedom of information: such knowledge is "helpful, perhaps indispensable, to the formation of an intelligent opinion by the public on how well the legal system is working and whether it should be regulated or even altered." (*In re Bates, supra,* 555 P.2d 640, 648 (dis. opn. by Holohan, J.).) At stake, in short, is not only petitioners' freedom of expression but the right of the public to information needed for appraisal and regulation.

The State Bar does not deny the First Amendment rights entailed in petitioners' discussions of legal services, but contends that petitioners may be disciplined because their communications with the media were directed more towards attracting clients than discussing the concept of a legal clinic. Primary reliance for this position is placed on *Belli v. State Bar* (1974) *supra,* 10 Cal.3d 824. As will be seen, however, under the rationale of *Belli* and a subsequent United States Supreme Court decision petitioners' communications cannot be construed as primarily commercial solicitation.

*Belli* concerned the attempts of an attorney, chiefly through his agent, to publicize some of his extra-legal activities. The State Bar recommended discipline because the agent, in seeking lecture dates and appearances on the air waves for the attorney, distributed publicity praising his client's talents as an attorney, the agent arranged for his endorsement of a brand of liquor, and the attorney himself advertised the "Belli seminars."

We held that only two items were proper subjects of discipline—the liquor advertisement and certain language in the seminar publicity which suggested that various celebrities who were former clients of the attorney planned to pay homage to him. All the other communications were protected by the First Amendment, we held, because they were directed towards facilitating the success of protected activities—the lectures and the seminars. Because of this praiseworthy purpose, even the most extravagant language—e.g., describing the attorney as the

---

[6]The author of a book about attorneys, referring to an ABA canon similar to rule 2, observed that "by denying the society important information about what lawyers do and how they do it, professional secrecy has both protected the bar from criticism of the kind that improves performance and stimulated criticism of the kind that shakes confidence." (Mayer, The Lawyers (1967) p. xiii.)

"King of Torts"—was not a cause for discipline. We declared, "when the bar seeks to discipline an attorney for a communication incident to protected speech, in addition to showing that the attorney intended by his communication to generate business for his law practice [citations], it must demonstrate that the communication or a part thereof was *principally directed* toward this end. We build into this construction of rule 2 a belief that the speech interest prevails over the desire of the bar to minimize solicitation of legal business both because the former is anchored in the federal Constitution and because it is properly accorded a fundamental position within that document." (Fn. omitted; italics in original.) (*Id.,* at p. 833.)

Despite this strong First Amendment statement, the State Bar urges a narrow construction of the principles affirmed in *Belli,* asserting that a communication is outside the scope of First Amendment protection if it contains *any* language that can objectively be viewed as being directed towards the solicitation of clients.[7]

Whatever vitality this viewpoint might once have had is now negated by the Supreme Court's decision in *Bigelow* v. *Virginia* (1975) 421 U.S. 809 [44 L.Ed.2d 600, 95 S.Ct. 2222]. In *Bigelow* the high court struck down Virginia's attempt to prohibit a newspaper advertisement that announced the availability of legal New York abortions and detailed whom to contact in order to obtain such services. In response to the state's argument that the advertisement was merely unprotected commercial speech—similar to the State Bar's contentions herein—the court declared: "The advertisement published in appellant's newspaper did more than simply propose a commercial transaction. It contained factual material of clear 'public interest.' Portions of its message . . . involve the exercise of the freedom of communicating information and disseminating opinion. [¶] *Viewed in its entirety,* the advertisement conveyed information of potential interest and value to a diverse audience—not only to readers possibly in need of the services offered, but also to those with a general curiosity about, or genuine interest in, the subject matter or the law of another State and its development, and to readers seeking reform in Virginia. . . . Thus, in this case, appellant's First Amendment interests coincided with the constitutional interests of the general

---

[7]We recognize that certain language in *Belli* can be taken to suggest it is permissible to read a communication line by line in order to determine whether it is directed at least in part towards soliciting clients. However, in *Belli* we did not specifically address the issue whether a communication may be judged for First Amendment purposes on anything less than its whole tenor.

public." (Fn. omitted; italics added.) (*Id.*, at p. 822 [44 L.Ed.2d at p. 612]; see also *State* v. *Nichols* (Fla. 1963) *supra*, 151 So.2d 257, 259 (holding that some of the attorney's answers to the reporter's questions might, "[i]f read in isolation," be construed as self-laudatory, "but not so if read in context").)

The high court in *Bigelow* was thus willing to overlook some of the "commercial" language in the abortion advertisement in order to protect the advertisement's underlying theme. The court held, in effect, that if any valid purpose can be found in a message, the communication cannot constitutionally be prohibited absent a compelling state interest. Such a test is necessary to afford breathing room for First Amendment freedoms, particularly in the present context. If the State Bar's interpretation of *Belli* were adopted, a lawyer speaking to the media would be compelled to measure his every word. As even the most articulate political candidates have not infrequently discovered, slips of the tongue and remarks later reconsidered are not uncommon in press interviews. While this fact of life has rarely discouraged office seekers, it might have a more sobering effect on attorneys, whose gaffes could cause them not mere political embarrassment but loss of livelihood. Lawyers by training are a cautious breed. If they are aware that any statements they make to the press will be scrutinized line by line by bar authorities in order to uncover a subtle intent to solicit business, their reaction will be predictable: they will avoid the "prohibited zone" by simply declining press interviews altogether. (See *Speiser* v. *Randall* (1958) 357 U.S. 513, 526 [2 L.Ed.2d 1460, 1472-1473, 78 S.Ct. 1332]; *Siegel* v. *Committee of Bar Examiners* (1973) 10 Cal.3d 156, 175 [110 Cal.Rptr. 15, 514 P.2d 967].) Such a result is unacceptable in a free society.

■ Accordingly, we synthesize *Belli* and *Bigelow* by concluding that a communication is not "primarily directed" toward solicitation unless, viewed in its entirety, it serves no discernible purpose other than the attraction of clients. If a legitimate purpose appears on the face of a publication or in the demonstrated motivation of the attorney, the publication must receive at least prima facie First Amendment protection.

■ Applying this test to the present case, we find that petitioners' statements, whether viewed objectively or subjectively, have constitutionally protected value. To be sure, some of their remarks taken in isolation might be deemed indirect solicitation, such as their disclosure in interviews of comparative fees and their use of client responses to

questionnaires in the press kit.[8] Nevertheless, those communications must be viewed in the overall context of petitioners' statements to the media, which served the legitimate purposes of delineating the need for low cost legal services for middle income persons and of explaining and demonstrating that the legal clinic was a pragmatic method of providing those services.

In this connection the State Bar emphasizes that petitioners continued to engage in interviews even though previous articles assertedly "focused upon them rather than upon the general concept of the legal clinic." The argument appears to rest on the dubious assumption that the First Amendment protects only abstract discussion, a position long since refuted by the Supreme Court: "abstract discussion is not the only species of communication which the Constitution protects; the First Amendment also protects vigorous advocacy, certainly of lawful ends, against governmental intrusion." (*N. A. A. C. P.* v. *Button* (1963) *supra,* 371 U.S. 415, 429 [9 L.Ed.2d 405, 416].) To suggest that petitioners should have somehow taken steps to insure that the articles avoid focusing on them is to escape from reality. As the reporters undoubtedly realized, a reader seeking information on low cost legal services would not be particularly interested in abstract philosophizing on the topic of

[8]In *Belli* we strongly disapproved of a member of the bar publicizing client testimonials for the purpose of soliciting legal business, and we do not hesitate to reaffirm that view: "An attorney, in our opinion, cannot advertise that he has performed his services so well that his clients consequently praised him." (10 Cal.3d at p. 838.) But the facts of the case at bar clearly distinguish it from *Belli.* At issue there were announcements of Belli's forthcoming seminar which included a long list of names of political and show business celebrities identified as clients or friends of Belli who were "Expected to attend and pay tribute to Mr. Belli" (*id.,* at p. 837, fn. 12). We reasoned that "exposition of an attorney's accomplishments in an effort to interest persons in attending a constitutionally protected communication, is one thing; suggesting, in the process, that because dazzled by the services they have received from the attorney, clients intend to attend in order to pay tribute to the attorney is quite another." (Fn. omitted; *id.,* at p. 838.)

No such suggestion appears in the present record. The documents here in issue are a representative sample of one-page questionnaires sent out by petitioners to their clients and filled in and returned by the latter. In each instance the questions asked of the recipient are typically those found in a market survey: e.g., why had he patronized petitioners' clinic, how did he learn of it, would he recommend it to others, how does he rate its services, had he consulted another attorney before coming to the clinic, and if so, what had his experience been. Such questionnaires are designed to assist the person conducting the survey to improve his product or services in the future. Moreover, not only was it optional for each recipient to decline to sign the questionnaire, but before reproducing them in the press kit petitioners blanked out the names of all who did sign, in order to protect their privacy. The resulting quasi-statistical material is a far and muted cry from the boast of the press agent in *Belli* that among many named celebrities were clients who intended to "pay tribute" to the attorney in question.

legal clinics by two obscure young attorneys, however articulate they might be. Rather, such a reader would want to know what a clinic is, how it works, how much it costs, and to what extent it might benefit him personally. As these petitioners apparently operated the only legal clinic in Los Angeles, the articles inevitably centered on their practice. But that circumstance should not be permitted to obscure the fact that the articles, and petitioners' cooperation in their publication, served a legitimate purpose in bringing an important issue to the public eye.[9]

Moreover, on the record before us it is undeniable that petitioners were motivated by more than a desire to generate business for their law firm. The local committee specifically found that petitioners' conduct "was intended by them to publicize a belief they honestly held that there is an unmet demand by low and middle income persons for competent legal services in certain areas of the law at reasonable cost . . . ." In its sole revision of the committee's findings, the disciplinary board modified that statement by adding the words, "in part." Even with that unexplained addition, the disciplinary board's conclusion can only be read as an affirmation that petitioners were at least partly motivated by a desire to raise a vital public issue. That petitioners may also have suspected the resulting publicity could attract clients does not strip their communications of First Amendment protection. To hold otherwise would subject to motivational scrutiny lawyers who write books about their major cases—all of which, by their accounts, resulted in glorious victories, or at least valiant defeats; attorneys who stand as candidates in political campaigns which have little chance of success but inevitably make their

[9] Without explaining its relevance, the State Bar devotes extended discussion to demonstrating that because all the individual cost-saving techniques adopted by the Legal Clinic of Jacoby and Meyers had previously been used by others, the only unique feature of the clinic was its title. In so arguing, the State Bar appears to be suggesting that the clinic was not really newsworthy. But petitioners and other witnesses before the local committee testified that the uniqueness of the clinic was in the *combination* of cost-saving factors that resulted in comparatively low fees for certain kinds of cases. As the State Bar does not deny that petitioners were able to charge low fees because of their combined economies, we strain to find the point of its argument. In any event, the State Bar's conception of newsworthiness appears to defy that of such magazines as Time, Newsweek, Harper's, Juris Doctor, and Business Week, and such newspapers as the Los Angeles Times, the Christian Science Monitor, and the Los Angeles Daily Journal, a newspaper focusing almost entirely on the legal community; and most recently the Los Angeles Bar Journal, official organ of the Los Angeles County Bar Association, published an article by petitioner Meyers entitled *Legal Clinics: Their Theory and How They Work.* (Vol. 52 (Sept. 1976) p. 106.) Finally, we note that the State Bar's perception of what constitutes an interesting new concept in the delivery of legal services is not shared by the American Bar Association, which, as mentioned previously, is funding its own experimental legal clinic.

names known to the public; and lawyers who participate in community activities likely to engender favorable publicity.[10]

But even to the extent that petitioners' statements could be interpreted as subtle solicitation, they still have First Amendment value. This is demonstrated in a line of Supreme Court cases involving group legal services, and in a recent decision on prescription drug price advertising.

Beginning with *N. A. A. C. P.* v. *Button* (1963) *supra*, 371 U.S. 415, the high court, in a series of decisions, rejected "the contention that 'solicitation' is wholly outside the area of freedoms protected by the First Amendment." (*Id.,* at p. 429 [9 L.Ed.2d at pp. 415-416].) In *Button*, the court upheld the right of NAACP attorneys to solicit plaintiffs for desegregation suits. While the court emphasized the constitutionally significant goals sought by the civil rights organization, it did not rest its decision exclusively on those grounds. In three subsequent decisions, the court ruled that labor unions had the right to direct their members to certain attorneys to handle job-related personal injury claims. (*United Transportation Union* v. *Michigan Bar* (1971) 401 U.S. 576 [28 L.Ed.2d 339, 91 S.Ct. 1076]; *Mine Workers* v. *Illinois Bar Assn.* (1967) 389 U.S. 217 [19 L.Ed.2d 426, 88 S.Ct. 353]; *Railroad Trainmen* v. *Virginia Bar* (1964) 377 U.S. 1 [12 L.Ed.2d 89, 84 S.Ct. 1113, 11 A.L.R.3d 1196].) Although clients in these cases were solicited to file lawsuits involving economic rather than political issues, the court declared, "the First Amendment does not protect speech and assembly only to the extent it can be characterized as political." (*Mine Workers, supra,* 389 U.S. at p. 223 [19 L.Ed.2d at p. 431].) In the most recent of these legal services cases Justice Black summarized, "the common thread running through our decisions . . . is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment. However, that right would be a hollow promise if courts could deny associations of workers or others the means of enabling their members to meet the costs of legal representation." (*United Transportation Union, supra,* 401 U.S. at pp. 585-586 [28 L.Ed.2d at p. 347].) The decisions thus stand for the proposition that an indirect

[10] In a different context, an Illinois Supreme Court justice has written: "Nor is it amiss to note that opulent lawyers and large law firms who do not employ 'runners' to attract business do spend large sums of money for memberships in country clubs, entertainment in fashionable surroundings and other similar amenities of social intercourse. That the primary purpose of these expenditures is the attraction of law business and not hospitality is attested by the fact that such lawyers regularly claim and the Internal Revenue Department regularly allows deductions of these expenditures as 'business' and not 'personal' expenses." (*In re Cohn* (1957) 10 Ill.2d 186 [139 N.E.2d 301, 306] (Bristow, J., conc. on consideration of petn. for rehg.).)

denial of access to the courts, no less than a direct prohibition, is subject to First Amendment scrutiny.

Of course, the cited cases dealt only with restraints on group legal services, but it would be difficult to formulate a rationale so limiting the meaning of the decisions. As one commentator has pointed out, the cases focused "not on the right of attorneys to advertise and solicit but rather on the importance of ensuring that those aggrieved receive information regarding their legal rights and the appropriate means of effectuating them, . . . Viewed in such a context, advertising and solicitation conducted by private attorneys deserves, if anything, *more* protection than that by attorneys affiliated with organizations like the NAACP or the United Mine Workers. Potential clients who are so dispersed, disorganized, and powerless that they cannot organize their own litigation programs would seem to be in even greater need of information regarding their legal rights than those who at least possess the strength required to generate their own litigation activities." (Fns. omitted; italics in original.) (Note, *Advertising, Solicitation and the Profession's Duty to Make Legal Counsel Available* (1972) 81 Yale L.J. 1181, 1186.) Put more succinctly, "It would make no sense for an individual's right of access to legal action to cease to exist, or not to come into existence at all, at the moment he ceases to belong to a group." (*Freeman & Bass, P.A.* v. *State of N.J. Comn. of Invest.* (D.N.J. 1973) 359 F.Supp. 1053, 1057, vacated on other grounds (3d Cir. 1973) 486 F.2d 176; see also Comment, *Solicitation by the Second Oldest Profession: Attorneys and Advertising* (1973) 8 Harv.Civ. Rights-Civ.Lib.L.Rev. 77, 87.)

More recently, the *Board of Pharmacy* decision also demonstrates that solicitation is not without First Amendment value. There the Supreme Court struck down a Virginia law prohibiting pharmacies from advertising prices for prescription drugs, and in so doing laid to rest the view that so-called "commercial speech" is beyond the protection of the First Amendment. (See, e.g., *Valentine* v. *Chrestensen* (1942) 316 U.S. 52 [86 L.Ed. 1262, 62 S.Ct. 920].)

The court first disposed of the argument that an advertiser has no First Amendment rights because his interests are purely economic rather than political. Analogizing to economic confrontations between employers and employees, the court noted, "We know of no requirement that, in order to avail themselves of First Amendment protection, the parties to a labor dispute need address themselves to the merits of unionism in

general or to any subject beyond their immediate dispute." (Fn. omitted.) (425 U.S. at pp. 762-763 [48 L.Ed.2d at p. 359].) In addition to pointing out the rights of the advertiser, the court emphasized the First Amendment interests of society in general—in ensuring that resource allocation decisions in a free enterprise economy be made intelligently —and of the consumer in particular, in receiving information on how to order his life. As for the latter, "that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate.... Those whom the suppression of prescription drug price information hits the hardest are the poor, the sick, and particularly the aged." (*Id.,* at p. 763 [48 L.Ed.2d at p. 359].)

Restrictions on information about the legal profession affect an even broader range of citizens. A Missouri Bar Association survey showed, for example, that only 36 percent of the state's residents had ever used a lawyer, compared to the 63 percent the survey concluded probably needed counsel. (Comment, *Controlling Lawyers by Bar Associations and Courts* (1970) 5 Harv.Civ. Rights-Civ.Lib.L.Rev. 301, 351.) Another survey in one city demonstrated that "the inability of persons to recognize legal problems increased as their socioeconomic status decreased." (*Ibid.*) The First Amendment consumer interest articulated in *Board of Pharmacy* appears as important in the present case as it was there.

The State Bar, however, points to two caveats in *Board of Pharmacy* and contends they undercut any First Amendment protection claimed by petitioners. In one footnote, the high court stressed that not all distinctions between commercial and noncommercial speech should be disregarded. There are differences between the two forms, the court noted: "The truth of commercial speech, for example, may be more easily verifiable by its disseminator than, let us say, news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else. Also, commercial speech may be more durable than other kinds. Since advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and forgone entirely." (*Id.,* at p. 772, fn. 24 [48 L.Ed.2d at p. 364].)

Neither of these rationales applies to petitioners' case. The greater objectivity and susceptibility of verification of commercial speech may justify certain restrictions regarding misrepresentation, but petitioners

have not been charged with deliberately making any misleading statements. And while paid commercial advertising is unlikely to be chilled entirely by proper regulation, the type of conduct engaged in by petitioners—voluntary participation in media interviews—is likely to have been and may continue to be deterred by restrictions such as those the State Bar seeks to impose.

The other caveat in *Board of Pharmacy* relied on by the State Bar concerns the issue of legal advertising itself. The court noted it was not deciding that issue, reasoning that "the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional services of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising." (Italics deleted.) (*Id.,* at p. 773, fn. 25 [48 L.Ed.2d at p. 365]; see also conc. opn. of Burger, C. J., at p. 774 [48 L.Ed.2d at p. 366].) It is important to articulate what this caveat does and does not signify. It does state that certain kinds of professional advertising may possibly be regulated—a matter now under consideration in the high court (see fn. 4, *ante*)—if a state can demonstrate that such regulation is necessary to effect an overriding governmental interest in preventing "confusion and deception." But it cannot be construed to mean that commercial speech by attorneys is entirely beyond the scope of First Amendment protection; such a construction would be completely contrary to the holding and reasoning of the majority opinion. The footnote thus stands for the proposition that while the First Amendment values in commercial advertising remain constant regardless of the profession involved, the governmental regulatory interest may vary from profession to profession. In short, a "commercial speech" case can no longer be decided merely on the basis of labels; the First Amendment now demands an analysis of the competing interests.

To summarize, under the foregoing decisions petitioners' conduct must be viewed as discussion of an important issue rather than solicitation; but even to the extent their communications can be interpreted by some to be solicitation, they are still not beyond the pale of the First Amendment. In either case, the State Bar has the burden of demonstrating that the prohibition of petitioners' contacts with news media is necessary to further a compelling state interest.

Seeking to meet this heavy burden, the State Bar recounts in minute detail prior cases before this court in which attorneys who solicited business also defrauded, coerced, and frustrated the interests of their clients. The purport of this melancholy recital is summed up in one sentence: "Attorneys who commit acts of solicitation are prone to excesses." Needless to say, such generalized reasoning is insufficient to override the significant First Amendment values asserted by petitioners. The State Bar fails to demonstrate either the absence of less restrictive alternatives in curbing such purported excesses; or the applicability of this parade of horrors to the type of activity engaged in by petitioners, i.e., participation in news interviews; or its relevance to the actual conduct of petitioners, who are obviously not accused of deception, fraud, misrepresentation, or any other actions damaging to their clients.

■ A clearer analysis is therefore needed. We must consider the interests often advanced in support of advertising prohibitions. Assuming, without deciding, that such state interests may legitimize certain types of restrictions on attorney advertising, we must determine whether they also justify proscribing the type of conduct engaged in by petitioners here.

Perhaps the primary state interest advanced in support of attorney advertising restrictions is prevention of fraud and misrepresentation. It is often argued that deception inevitably accompanies advertising and that some forms of attorney advertising are inherently misleading. (See, e.g., *Board of Pharmacy, supra,* 425 U.S. at pp. 774-775 [48 L.Ed.2d at pp. 365-366] (Burger, C. J., conc.).) A related contention is that if the restrictions are relaxed, lawyers will engage in "puffing," i.e., exaggerating their abilities and what they can do for their clients.

It can readily be seen, however, that such concerns relate at most to paid advertisements written by or at the direction of the attorney himself, and to direct solicitation of clients by the attorney. The danger is not necessarily inherent in an attorney's cooperation with the publication of a news story. In order for an attorney intentionally to mislead the public through a bona fide news article it would be necessary for him first to convince reporters and editors that he is newsworthy, then induce them to print what he relates without verification and hope the public accepts the tale at face value. To project this scenario as likely to occur requires a cynical view of both journalistic integrity and public gullibility. Journalists have never demonstrated a desire to serve as "cappers" or "runners"

for attorneys: except in sensational cases or when performing ·a relatively unusual service—as here—attorneys are rarely "news."[11]

Even if an attorney does manage to get his name in print or on the air, he does not have control over the content of the journalist's story; thus, any misstatements by the attorney can be checked by diligent reporters. In the present case, for example, most of the reporters writing about the legal clinic apparently verified important information given to them by petitioners before printing it, and some conducted further interviews to ascertain the quality of the services being offered. Also, it bears reiterating, the State Bar found no instance in which petitioners deliberately misrepresented facts to reporters or exaggerated their abilities in any way.

Another argument often advanced against solicitation is that it may be associated with overreaching and high pressure tactics to acquire clients. Spectres of ambulance chasing and coercion of patients in hospital beds are often raised. Unfortunately such behavior does occasionally occur, and it is subject to discipline; but the concern is inapplicable to the conduct here shown. Insofar as former rule 2 has prevented overreaching, it has done so in its application to direct solicitation of clients by attorneys or their employees, not to indirect presentation through media interviews.

It is sometimes argued that solicitation is " 'demoralizing to the ethical standards of [the] profession.' " (*Goldfarb* v. *Virginia State Bar* (1975) 421 U.S. 773, 792 [44 L.Ed.2d 572, 588, 95 S.Ct. 2004], quoting from *United States* v. *Oregon State Med. Soc.* (1952) 343 U.S. 326, 336 [96 L.Ed. 978, 986, 72 S.Ct. 690].)[12] This point is expressed in different ways: it is said solicitation robs the bar of dignity, or creates an atmosphere of commercialism rather than professionalism. However the argument is

---

[11]This fact of life was demonstrated in *Bushman* v. *State Bar* (1974) *supra*, 11 Cal.3d 558, in which an attorney launched a concerted blitz of self-aggrandizing press releases. Of the numerous releases sent on various pretexts—e.g., heralding the arrival of a new associate, announcing a new telephone number, or reporting the attorney's appointment to certain committees—only one was ever published, and that in a small "shoppers' guide." (*Id.*, at pp. 566-569.)

[12]The key to the dissent is its policy declaration that "the public will be the eventual loser" (*post*, p. 394) if solicitation by attorneys is countenanced. Perhaps so, although the dissent cites no authority for its ipse dixit conclusion. There are, on the other hand, many lawyers, legal scholars and consumer advocates who would argue the negative in a debate on that proposition. They would insist that "the public will be the eventual winner" if the availability and cost of legal services are more widely disseminated. We need not resolve this broad policy issue in the case at hand.

phrased, it is manifest that "the evil at which anti-advertising rules are aimed is the employment of *commercial* methods of obtaining business. The impropriety of paying for the publication of stories and photographs is not involved in bona fide news stories." (Fns. omitted; italics in original.) (Note, *Bar Restrictions on Dissemination of Information About Legal Services* (1974) 22 UCLA L.Rev. 483, 512.) The dignity and morals of the bar will not be jeopardized—indeed, they are likely to be enchanced—by the scrutiny of the press.

Finally, it is argued that solicitation must be curtailed because it stirs up unnecessary or fraudulent litigation, a contention premised on the notion that "to avoid court congestion, discouragement of even legitimate claims must be tolerated in order to prevent the bringing of fraudulent or frivolous actions." (*Id.,* at p. 511.) To the extent that such an argument is plausible (see contra, *N. A. A. C. P.* v. *Button* (1963) *supra,* 371 U.S. 415, 439-444 [9 L.Ed.2d 405, 421-425]), it plainly is not germane here. While direct solicitation may increase the volume of lawsuits filed, there is no empirical data that attribute even a marginal increase in litigation to newspaper articles or television broadcasts.

We conclude the State Bar is unable to meet its burden of demonstrating a compelling state interest in this instance. Accordingly, it may not constitutionally proscribe petitioners' conduct. We reemphasize that although a portion of this opinion has discussed professional advertising, we do not decide that issue. But the State Bar cannot justify disciplinary proceedings against attorneys whose only "offense" was to exercise rights which are among the most precious to our citizenry—freedom of speech and freedom of the press. In this sensitive area we should beware of confusing innovation with impropriety.[13]

The proceedings against petitioners are dismissed.

Tobriner, Acting C. J., Clark, J., Sullivan, J.,* and Wright, J.,† concurred.

---

[13]Petitioners also assert (1) that the proceedings against them violate their rights to equal protection because they constitute discriminatory enforcement of former rule 2, and violate the due process clause because of an alleged conflict of interest between petitioners and those judging them; and (2) that former rule 2 violates the Sherman Anti-Trust Act. As we dismiss the proceedings on the ground stated, we need not reach these additional issues.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

RICHARDSON, J.—I respectfully dissent, being unable to agree either with the majority's conclusion or the reasoning by which it is reached. In my view, the majority has ignored the explicit findings of fact of the disciplinary board, has both misstated and misapplied existing law on the subjects of professional advertising and client solicitation and, for purposes of ascertaining whether there has been client solicitation has enunciated a new standard which is not calculated to serve either the public or the legal profession.

Because the majority's factual recitation of the case is abbreviated, I develop somewhat more fully the background of this case as reflected in the record before us.

In the latter part of 1972, under the name of "Meyers and Jacoby," petitioners formed a law partnership in Beverly Hills which in December of that year moved its principal offices to Westwood. In January of 1973 the firm was expanded to include Mr. Mosten and the firm, now known as "Meyers, Jacoby & Mosten," continues to practice in its Westwood office. In September 1972 Jacoby and Meyers opened a second office in Van Nuys which they designated "The Legal Clinic of Jacoby & Meyers" and, sometime later, established a third branch in the City of Inglewood, modelled on their Van Nuys office. The members of the law partnership were and are Meyers and Jacoby, each holding a 37½ percent interest, and Mosten with a 25 percent interest. The partnership thus conducts its practice in three locations under a single general partnership agreement and files a single federal income tax information return.

The partners anticipated that their Westwood practice would continue as a general civil, business-oriented practice and that the Van Nuys and Inglewood offices would specialize in what they termed a "middle income" practice. They described this type of practice as one limited primarily to cases involving domestic relations, adoptions, bankruptcy and debtor-creditor affairs, personal injury, criminal, real estate, debt collections, wills, consumer, and administrative matters. (Parenthetically, it may be said that these kinds of cases describe a large portion of the practice of many California lawyers.) Occasionally, cases which originated in the Van Nuys office were referred to the firm's Westwood office

Prior to their opening in Van Nuys petitioners prepared and distributed a "prospectus" describing the function of their new office. Among others receiving the prospectus was a representative of a consumers

organization, Consumer Legal Action Council (Council), who conceived a plan for conducting an "open house" in conjunction with the partners' Van Nuys office. With the full knowledge and approval of Jacoby and Meyers the Council circulated among the major Los Angeles radio and television stations and the two principal Los Angeles daily newspapers a summary of the prospectus, and extended to numerous representatives of the press, radio and television a printed invitation to attend the open house.

At approximately the same time, a printed folder entitled "A Message to Our Clients" was prepared by Jacoby and Meyers which described the services of their Van Nuys practice. Under the heading "What the Legal Clinic Is" the "message" declared: "The LEGAL CLINIC of Jacoby & Meyers is the first of its kind . . . . People in the largest sector of our society—the middle income—must either do without lawyers and give up their rights or, when lawyers cannot be avoided, pay much more than they can afford. The LEGAL CLINIC has, for the first time, adopted a common sense approach to providing high quality, low-cost legal services." The "message" also contained a sample description of fees which petitioners proposed to charge. These included, among others, "dissolution of marriage in which there is no support, children, or property $100; uncontested dissolution with property settlement agreement (minimum) $250." This "message" was distributed to members of the media and to other members of the public who attended the open house.

During and following the open house, Jacoby and Meyers in interviews with two Los Angeles newspapers, and with a Los Angeles radio station, described their new Van Nuys office as a first of its kind, modelled after a medical clinic, charging low fees and using paralegals and part time specialists. During the radio interview Jacoby, referring to their practice, stated, "People will be assured . . . of high quality legal services." During the ensuing several months, both before and after the institution of the State Bar disciplinary proceedings, petitioners granted further interviews to the media, including a newspaper and national magazine. Jacoby, during the course of an interview on a Los Angeles radio station, discussed the Van Nuys practice, including the specific fees that the partners were charging and repeated the comment that "At the clinic . . . the client is assured of quality at reduced rates."

Because of the extensive publicity generated by petitioners' open house and use of the name "clinic," a formal investigation was instituted

by the State Bar on September 27, 1972. Sometime later, after a formal notice to show cause was issued, Jacoby and Meyers commenced a preplanned and carefully orchestrated publicity program. For the purpose of advising the public of the State Bar's action, they called a press conference at which they distributed a 59-page "press packet," or "press kit" containing material directed at the pending bar disciplinary proceeding. In a "Background" portion of their kit, and on the firm's letterhead, petitioners described the success of their Van Nuys practice as "overwhelming, from all directions," and reported that they had doubled their staff, had served 1,000 clients, that their Van Nuys office was now handling "about 1% of all the divorces in Los Angeles County," and that two Los Angeles newspapers, a national newspaper, a national magazine, "and numerous local and network radio and television stations have all carried favorable stories about its concept and operation."

Turning then to their accuser, the State Bar, petitioners in their press kit charged that the reason for the disciplinary investigation was ". . . that the Bar felt economically threatened by such a successful attempt at delivering high quality, low cost legal services." Confidently anticipating victory, petitioners predicted that ". . . the courts will see the case for what it is—an attempt by a narrow self-interest group to muzzle its competitors."

The press packet contained more. After a biography describing the attorneys associated with the clinic, a detailed seven-page comparative fee schedule was included in which the fees charged by Jacoby and Meyers in the nine broad areas of their practice were compared with the minimum fee schedules adopted in 1970 and 1971 by the San Fernando Valley Bar Association and the Burbank Bar Association. On the prefatory page of the fee schedule petitioners pointedly observed that the fees of the associations "range generally from 40% to 250% higher than those currently charged by" petitioners.

Following the fee comparisons, petitioners included in the packet a series of 10 "representative" but anonymous responses to a written questionnaire which Jacoby and Meyers had circulated among their clients. With other questions, the clients were asked if the services rendered by the firm's paralegal staff and attorney were good, fair, or poor, and how clients compared the Jacoby and Meyers services with those of any other attorney whom they had previously consulted. Not surprisingly, the responses selected were all favorable to the petitioners' office and, for the most part, unfavorable as to "other attorneys."

The packet also included copies of correspondence and pleadings regarding the State Bar proceeding, and a series of illustrated articles about their practice from the local and national newspapers and a national magazine.

After the initial press conference Jacoby and Meyers accelerated their public relations campaign with individual press interviews transcribed for radio and television. On one nationally televised program Meyers was filmed in his office along with members of his staff. Among other things, he said: "We handle a great volume here. We're open on evenings, we take Master Charge cards. What we've done is tried to make the office service oriented and to get away from the hangups that some attorneys have previously had . . . so we're happy to service domestic relations cases, divorces, bankruptcies, small claims court counselling, the kinds of things which other attorneys have traditionally not wanted to take." Meyers continued in his television interview: "People have a general impression of attorneys charging too much. For example in a default divorce here in California where there's no property or children, the simplest kind. In the San Fernando Valley, the charge is approximately three hundred and fifty to five hundred dollars. We would charge a hundred dollars for that. There's little more in that other than some filling out of forms, some initial consultation to make sure that that's what the person needs. It's not so much that they couldn't afford the three hundred and fifty dollars, but they weren't you know, they weren't getting three hundred fifty dollars worth of services. And we think ultimately the legal profession is in great disrepute right now. And one of the reasons is that attorneys are just charging too much for what they're giving. And if they're going to get back their respect, they have to get around that featherbedding in a way." After the television program, and entirely unsolicitated, Meyers sent a transcript of his televised remarks to a Los Angeles newspaper reporter.

During the same year a national magazine published an article coauthored by Meyers' wife after Meyers had approved the galley proof. The illustrated article described the Van Nuys practice, and contained fee comparisons of that office and other unidentified Los Angeles law firms. Jacoby and Meyers prepared reprints of this article and forwarded them with copies of three Los Angeles newspaper articles to a New York newspaper when Meyers confirmed arrangements for a subsequent newspaper interview.

Meyers issued a press release noting the State Bar evidentiary hearing and called the attention of media representatives again to articles about petitioners in newspapers and national magazines.

The record reflects two additional significant factors. The generation of the extensive and sustained publicity regarding the Jacoby and Meyers practice resulted in a substantially greater volume of legal work at their Van Nuys office than that attracted to either their Westwood or Inglewood facilities. Petitioners stated that they depended on a substantial volume of legal business to permit the lower fees charged by them in their Van Nuys practice.

The disciplinary board found that petitioners wilfully furnished detailed information concerning their law practice to members of the news media, and that although petitioners' conduct was *in part* intended to publicize the general features of low cost "legal clinics" serving low and middle income persons, nevertheless petitioners' detailed references to their own law practice, fee schedules and personnel were "intended to generate business for their said law practice, and said portions of said conduct and communications [to news media] *were principally directed toward that end.*" (Italics added.) Accordingly, the board concluded that petitioners "wilfully advertised their law practice and wilfully solicited professional employment," in violation of rule 2 of the Rules of Professional Conduct of the State Bar of California.

The Rules of Professional Conduct are formally adopted by the Board of Governors of the State Bar and become effective 60 days after approval by us. They are thereupon binding upon all members of the bar as provided in rule 1. Rule 2, section a, which Jacoby and Meyers are charged with violating, provided: "A member of the State Bar shall not solicit professional employment by advertisement or otherwise." This rule was broad. Rule 2-102, its successor provision, is more specific: "A member of the State Bar shall not prepare, cause to be prepared, use or participate in the use of, any form of public communication that contains professionally self-laudatory statements calculated to attract lay clients; as used herein, 'public communication' includes, but is not limited to, communications by means of television, radio, motion picture, newspaper, magazine, or book."

Preliminarily, I voice considerable doubt about the majority's definition of the principal question before us and the burden of proof herein presented. According to the majority, the narrow issue before us is

"Whether a lawyer may be prohibited from participating in the preparation of a news article about himself." I think the central issue is considerably broader, and may be more precisely stated: "Was the conduct of Jacoby and Meyers concerning publicity for their Van Nuys practice principally directed toward the generation of legal business thereby constituting the solicitation of professional employment in violation of rule 2?" Further, it is not at all clear that the majority is correct in its conclusion that the State Bar has the burden of demonstrating that the prohibition of petitioners' contacts with the news media is *necessary* to further a *compelling* state interest. The authority cited for such a proposition is *N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 438 [9 L.Ed.2d 405, 421, 83 S.Ct. 328]. It is significant, however, that the same high court very much later in *Bigelow* v. *Virginia* (1975) 421 U.S. 809, 826 [44 L.Ed.2d 600, 614, 95 S.Ct. 2222], expresses a somewhat less rigid standard, observing that: "Advertising, like all public expression, may be subject to reasonable regulation that serves a legitimate public interest."

In considering the principal issue, contrary to the majority view, we are not in strange territory. Very recently in *Belli* v. *State Bar* (1974) 10 Cal.3d 824 [112 Cal.Rptr. 527, 519 P.2d 575], we announced principles which are dispositive of the matter before us. *Belli*, like the present case, involved the application of rule 2 within the context of a First Amendment challenge. In *Belli* we carefully distinguished communications relating to an attorney's projected seminars and lecture series, finding them within the area of constitutional protections; but we left undisturbed the State Bar anti-solicitation rule in areas in which no free speech rights were affected. Furthermore, even in those situations involving some element of protected speech, we declared that discipline may be imposed if the bar shows that the attorney's "communication or a part thereof was *principally directed* toward" (p. 833) the end of generating business for his law practice. *Belli* expressed a clear, easily understood and workable standard, namely, was the communication or part of it *principally* aimed at getting legal business or were other, more altruistic purposes the primary goal?

With due respect, I suggest that the majority now announces a new rule, abandons clarity, and expands to the point of destruction the *Belli* standard, to the advantage of no one save Jacoby and Meyers. The majority concedes that "some of their [petitioners'] remarks taken in isolation might be deemed indirect solicitation." In *Belli* we inquired whether the communication was "*principally* directed" at legal business. The majority now changes this standard, and we now are to be concerned only if the communication is "*solely* directed" to the same

end, and are to determine if there is *any* discernible subjective purpose other than that which is prohibited.

Such a precipitous retreat from the *Belli* standard is compelled, so argues the majority, because of First Amendment considerations enunciated by the Supreme Court in *Bigelow* v. *Virginia, supra,* 421 U.S. 809. I respectfully suggest that the familiar *Bigelow* holding is clearly distinguishable, and its language is not useful to the majority. The "communication" which the *Bigelow* court "viewed in its entirety" was a single small newspaper advertisement. The "communication" before us, in stark contrast, constitutes a large volume of public expressions, spanning many months, including verbal and written announcements, press interviews, radio and television broadcasts, magazine and newspaper articles, circulars, pamphlets, press releases and news conferences. Only by extrapolating to the point of absurdity can one conclude from *Bigelow* that all statements and activities touching upon a particular issue must necessarily constitute, for First Amendment purposes, a single, multi-faceted, conglomerate communication. In addition to the *form* of the communication, the *Bigelow* court found significance in the *nature* of the communication. *Bigelow* involved the prosecution of a newspaper editor for publishing an advertisement describing an out-of-state abortion clinic. The court expressly noted that New York's abortion practices were *not* subject to regulation by Virginia, and that the latter had little or no legitimate interest in depriving its citizens of access to information about activities beyond its borders. (*Bigelow* v. *Virginia, supra,* at pp. 827-828 [44 L.Ed.2d at pp. 614-616].) The high court then said, "the fact that the statute was applied against . . . [the appellant] as publisher and editor of a newspaper, *not against the advertiser* or a referral agency *or a practitioner* . . . thus . . . [created] more serious First Amendment overtones." (*Id.,* at p. 828 [44 L.Ed.2d at p. 615], italics added.)

The majority concludes that the *Bigelow* court "held in effect" that if *any* valid purpose can be found in a message, the communication cannot constitutionally be prohibited in the absence of a compelling state interest. To the contrary, the court specifically abstained from any such generalization, concluding that "We need not decide in this case the precise extent to which the First Amendment permits regulation of advertising that is related to activities the State may legitimately regulate . . . ." (421 U.S. at p. 825 [44 L.Ed.2d at p. 613].)

While it is clear that both commercial and noncommercial varieties of speech are entitled to First Amendment protection, neither *Bigelow* nor

*Va. Pharmacy Bd.* v. *Va. Consumer Council* (1976) 425 U.S. 748 [48 L.Ed.2d 346, 96 S.Ct. 1817], on which the majority relies, suggests that protected activities with a commercial aspect cannot be regulated. Indeed, the high court itself has expressly cautioned against any conclusion that speech with a heavy commercial component is entitled to precisely the same scrupulous deference which is properly accorded, for example, to political debate. Its words are clear: ". . . commercial speech may be more durable than other kinds. Since advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and [so] forgone entirely." (*Va. Pharmacy Bd.* v. *Va. Consumer Council, supra,* at p. 772, fn. 24 [48 L.Ed.2d at p. 364].)

*Pharmacy Bd.* invalidated a statute forbidding pharmacists from advertising the prices of prescription drugs. Acknowledging that in such a case the underlying activity—the practice of pharmacy—was subject to regulation by the state, the court held that in view of the standardized nature of prescription sales, a flat ban on price advertising was an impermissibly sweeping method of discouraging potential misconduct. (*Va. Pharmacy Bd.* v. *Va. Consumer Council, supra,* 425 U.S. at pp. 768, 773, fn. 25 [48 L.Ed.2d at pp. 362, 365].) The high court emphasized a very clear limitation of particular relevance to the matter before us, stating, "We stress that we have considered in this case the regulation of commercial advertising by pharmacists. Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional *services* of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising." (*Ibid.*) The nature and extent of the difference alluded to presumably will be defined by the court when it decides *Bates* v. *Arizona State Bar* (Dock. No. 76-316) now pending before it. This distinction, noted by the Supreme Court, between the personal service professions and the ordinary trades is echoed in the traditional rejection by professions of those publicity practices which are acceptable in the commercial market place. The nonsolicitation principle embodied in rule 2 is a long-standing recognition of this pronounced difference.

In the matter before us the disciplinary board's recommendation, based upon findings that certain of petitioners' activities were *primarily directed* toward solicitation of clients, was wholly consistent with *Belli.* The majority's new expansive rule is contrary to *Belli.* The net effect of

this dilution, as a practical matter, is to relegate the operation of the anti-solicitation rule to paid advertising only. The end result, of course, is to immunize an attorney from disciplinary action for client solicitation so long as his more blatant activities are accompanied by any tenuously related commentary that might conceivably be of public interest.

The foregoing consequence is neither necessary nor desirable. Certainly, it is not compelled by either *Bigelow* or *Pharmacy Bd.* On the contrary, both cases acknowledge that advertising may be regulated, given an underlying activity that is properly within the sphere of state regulation, and a state interest of sufficient weight. (*Bigelow* v. *Virginia, supra,* 421 U.S. at pp. 825, 826 [44 L.Ed.2d at pp. 613, 614]; *Va. Pharmacy Bd.* v. *Va. Consumer Council, supra,* 425 U.S. at pp. 770-773 [48 L.Ed.2d at pp. 363-365].)

It is argued that we must dilute our *Belli* standard for two reasons. First, it is urged that the attorney's free speech rights must not be inhibited. I heartily and fully endorse the proposition that all citizens, attorneys most certainly included, must have the constitutionally guaranteed right to express their views freely, openly, and publicly on all issues and must have the widest latitude in doing so. There is a distinct professional line, however, between discussion and solicitation, between commentary and courting, between discourse and importuning. I think that we seriously err if we neither recognize nor respect that line. Lawyers, in my opinion, do not have a First Amendment right to solicit professional employment. In *Belli* we carefully compared and balanced the attorney's free speech rights with the nonsolicitation rule. Rule 2 and the First Amendment *can* be accommodated. Totally educational communications, on the one hand, and totally self-serving ones, on the other, present little difficulty. Within that murky gray area in the middle, where the line may be indistinct, the *Belli* inquiry focuses as a basis for regulation, upon those communications which are *primarily* directed toward solicitation. If we would but have it so, the rule which we announced so recently in *Belli* remains a reasonable and workable one.

Second, it is urged that as the speaker must be protected in his communication, so also must we insist upon ensuring that aggrieved persons receive adequate information regarding their legal rights. To my knowledge, no one engaged in the debate has seriously challenged that general abstraction. However, the important question remains—*how* is the public to be educated and informed? By what method is the "middle class" to be told of its rights and of the availability of lawyers to meet

them? In my opinion, this is being done, and doubtless can be done better, on a *collective* or *group* basis preserving the anonymity of individual practitioners. The public can be informed and served while the nonsolicitation rule is preserved. Bar associations can generate a healthy flow of information directed toward the "middle class," and widely publicize the skills, practices, specialties and indeed, the fees of attorneys. Such publicity is in complete harmony with rule 2 and the public will be informed and educated.

I am convinced, however, that the conduct here in question by which individual attorneys themselves purport to educate by publicizing their own practices, is not the road to take toward that commendable goal of bringing low-cost legal services to the middle class. The fact that the publicity arranged by Jacoby and Meyers involved almost all of the forms of news media, and was repeated and prolonged over many months, does not lessen, but if anything substantially aggravates, in my view, the seriousness of their conduct. In failing to recognize this fact, the majority thereby bestows its judicial blessing on solicitation. I foresee no gain but rather a predictable loss to the public interest in this judicial loosening of the self-imposed rules of professional discipline.

As above noted, the result achieved by the majority is unnecessary. There are now operating effectively in California lawyer reference services sponsored by bar associations which are processing many thousands of inquiries yearly and placing the middle class in touch with the practicing bar which is prepared to serve it. In this process attorneys frequently adjust fees to the more limited resources of individual clients. Some bar associations have gone further. Thus, the Santa Clara County Bar Association recently has organized a Dissolution Modest Means Panel as a step toward a full system of legal services for families whose combined gross annual income does not exceed $10,000. It is reported that 63 attorneys, having an average of 6½ years experience, have indicated a willingness to handle uncontested dissolutions for a modest fee. (The fees, incidentally, are either similar to or somewhat less than those advertised by Jacoby and Meyers.) The modest means program is publicized and referrals are received from the bar-sponsored Lawyer Referral Service or from individual lawyers and community legal services. Attorneys are chosen from an anonymous voluntary panel on a rotational and geographical basis. (San Jose Mercury News (Jan. 30, 1977).)

By such group or collective methods the legitimate needs of the middle income class are properly met while at the same time there is

maintained appropriate prohibition of solicitation by individual attorneys. By such a program the public is served by the skills of the quiet as well as the loud.

Using either the *Belli* standard, which incidentally all of the parties before us had assumed was the controlling measure, or the newly expressed test, the majority errs in insisting that petitioners' conduct "must be viewed as discussion of an important issue rather than solicitation" (*ante*, at p. 377), and that the solicitation, if any, is "indirect" (*id.*, at p. 371). With due respect, I suggest that my esteemed colleagues misread the record. Petitioners' blizzard of publicity pertaining to their Van Nuys office was anything but "indirect." There is nothing subtle or indirect about petitioners' preparation of a press kit that tells every reader that the attorneys in their Van Nuys office "all have excellent academic records"; that their success "has been overwhelming, from all directions"; that "approximately 1000 clients have been served"; that "the clinic is now handling one (1%) percent of all divorces in Los Angeles County"; that as to the seven pages of comparison of fees, "as can be seen, the suggested minimum fees of two to three years ago by the San Fernando Valley Bar Association and the Burbank Bar Association range generally from 40% to 250% higher than those currently charged by the Legal Clinic of Jacoby & Meyers." There is nothing subliminal about the selection and inclusion in the press packet, bearing Jacoby and Meyers' name, address and telephone number, of a series of 10 questionnaires from selected clients all of whom praised petitioners on the one hand while the clients found that "other attorneys" were "slow," "expensive," "pompous," "too professional," and "cold." This is not "indirect." While stressing the fact that in the questionnaires the names of the clients were concealed to "protect their privacy" the majority concedes, as it must, that in one of the news stories in a national magazine two clients were identified by name and their particular legal problems were mentioned.

Nor is there anything "indirect" about Meyers, as an attorney, stating on national television that "we're open evenings, take Mastercharge cards, happy to service domestic relations cases, divorces, bankruptcies, small claims court counselling, the kinds of things which other attorneys have traditionally not wanted to take—For example in a default divorce here in California where there's no property or children, the simplest kind. In the San Fernando Valley, the charge is approximately three hundred and fifty to five hundred dollars, we would charge a hundred dollars for that." It takes neither an unduly perceptive eye nor sensitive ear to detect a clear commercial ring to the message. The sell is not soft.

Furthermore, even under the majority's new standard, it is difficult to justify petitioners' publication and circulation of comparative price or fee schedules. The majority is hard put to support their use. It more easily dismisses as "quasi-statistical" material the client questionnaires likening them to a "market survey" (surely, a new term in the lexicon of the practicing lawyer) designed to "assist the person conducting the survey to improve his product or services in the future." (*Ante,* at p. 372). The benevolent characterization, "quasi-statistical," might well have been accurate had the questionnaires remained in the hands of the Jacoby and Meyers' office manager, the person directly interested in and responsible for office efficiency. What the majority ignores, however, is the fact that the questionnaires were turned over to the press. The conclusion, to me, seems inescapable that whatever the motivation for *compiling* the information, clearly it was *used* for advertising purposes.

All of the foregoing factors in combination with petitioners' admissions in the record that the publicity for their Van Nuys operations was important, that they depended upon a large volume of clients for the success of the clinic and for their reduced fees, and that their Inglewood clinic, for which they did not generate such a drumfire of publicity, had a much slower start, persuade me that the publicity was principally directed toward developing legal business for their Van Nuys practice. Even under the test newly expressed by the majority, I also conclude that as to the price and fee comparisons and the selective use of the questionnaires, the communications served "no discernible purpose other than the attraction of clients."

The majority appears to assume that petitioners' Van Nuys practice was so newsworthy as to justify the publicity. The majority refers to "significant differences" between petitioners' operations and a more traditional law practice. Seeking these significant differences, I find only three principal features which, according to Jacoby and Meyers, make their Van Nuys office unique or distinctive. The first is the wide use of forms which are apparently standardized by branches of their practice and placed in binders. However, among many California practitioners there is a widespread use of forms, either prepared by text writers (the publications of the Continuing Education of the Bar contain most useful practice and procedural forms) or assembled by the attorney from his or her own practice over the years. Second, is the use of paralegal or lay assistants, such as law students, in the initial "screening" of the client. Yet the gathering of preliminary and statistical information on legal matters has been performed very efficiently by legal secretaries and other nonlawyers for many years. The use of law students and paralegals is

steadily increasing. Indeed, there is now operative in this state a program for law students certified by the State Bar. A third characteristic of petitioners' Van Nuys practice is their use of part time specialist-attorneys who apparently come to the Van Nuys office at prearranged times for consultation purposes. This does seem unique and unusual and, perhaps following a medical model, may constitute a group approach to the practice more efficient than the traditional consultation with specialists in which most general practitioners periodically engage.

It is interesting to note, however, that when pressed to define the unique character, if any, of their Van Nuys practice, Jacoby stressed a "walk-in oriented" specialization practice, "store front, low cost," "more simple types of cases; if you have a complex civil litigation, or if you have business problems, this is not the law office for you." Meyers was no more specific in his description, calling it "storefront, modelled around a medical clinic. Generally accessible is what I mean by storefront. It doesn't necessarily have to be storefront, but it means maybe lower cost, accessible and modelled around a medical clinic." Such expressions, of course, are pleasingly vague. A "storefront" law office is difficult to define other than perhaps it is on the ground floor and on a main street, with adjacent parking, which description would fit literally hundreds of law offices in California.

When all of the foregoing is said, however, when finally the Van Nuys client has furnished the information required for the standardized forms, has been screened by the paralegal, nonlawyer assistant, and is meeting with the part time specialist, he is engaged in the age-old, face-to-face, consultation of an attorney with the client. At that point the Van Nuys operations of Jacoby and Meyers, under whatever name, and however internally organized, differ not one whit from that of thousands of other practitioners in this state when they confer daily with their clients.

In reaching the foregoing conclusions, I have been mindful of two well established principles. First, in close disciplinary cases the attorney is given the benefit of the doubt. More precisely, " 'all reasonable doubts will be resolved in favor of the accused and if equally reasonable inferences may be drawn from a proven fact, the inference which leads to a conclusion of innocence rather than one leading to a conclusion of guilt will be accepted.' " (*Millsberg* v. *State Bar* (1971) 6 Cal.3d 65, 68 [98 Cal.Rptr. 223, 490 P.2d 543].) Second, although we are not bound by the findings of the State Bar and must exercise our independent judgment, those findings nevertheless are entitled to great weight, and petitioners have the burden of showing that they are not supported by substantial

evidence. (*Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 443-444 [113 Cal.Rptr. 602, 521 P.2d 858].) I do not regard the case as close or doubtful on the principal issue of solicitation and believe there is strong and substantial evidentiary support for the board's findings. Petitioners insist that ". . . Rule 2 was created and designed with a different era in mind—that of a small town around the turn of the century." I hold a contrary view, namely, that the utility, both to the public and to the profession of the nonsolicitation rule remains strong and that, if anything, the need for it today is enhanced.

I think the majority errs in its rejection of our *Belli* standard, and by its adoption of a test which, insofar as I understand it, would immunize an attorney from discipline for client solicitation so long as his conduct is accompanied by any "protected" communication on a matter of public interest. Such a standard, in my opinion, is wholly lacking in support either in the cases or applicable rules or in sound policy. Furthermore, it is unworkable and dangerous. It would permit an attorney, directly or indirectly, to advertise for clients and to solicit with impunity so long as what is done is accompanied by a suitable "free speech" message. In such a manner, carefully conceived rules against advertising and solicitation can very easily be circumvented. The effect of such solicitation is not only unfair to other attorneys but, more importantly, I believe the public will be the eventual loser in any solicitation warfare between competing attorneys.

Under the principles announced by us in *Belli,* the disciplinary board in the matter before us expressly adopted findings of fact that the principal purpose of petitioners' communications was directed at the generation of legal business. The disciplinary board accordingly concluded that petitioners "wilfully advertised their law practice and wilfully solicited professional employment" in violation of rule 2. A review of the record discloses very substantial support for both the board's findings and conclusions. Accordingly, I would accept its recommendation that Leonard D. Jacoby and Stephen Z. Meyers be suspended from the practice of law for a period of 45 days.